976 F.2d 890
 61 USLW 2198, 77 Ed. Law Rep. 1142
 UNITED STATES of America, Plaintiff-Appellant,
v.
COMMONWEALTH OF VIRGINIA; Lawrence Douglas Wilder, Governor
of the Commonwealth of Virginia; Virginia Military
Institute; Joseph M. Spivey, III, President of the Virginia
Military Institute Board of Visitors; John Williams Knapp,
Superintendent of Virginia Military Institute; The Board of
Visitors of Virginia Military Institute; Thomas N. Downing;
Elizabeth P. Hoisington, Brig. Gen.; Robert Q. Marston;
A. Courtland Spotts, III; Daniel F. Flowers; B. Powell
Harrison, Jr.; Robert H. Spilman; Samuel E. Woolwine;
James W. Enochs, Jr.; William A. Hazel; Harvey S. Sadow;
Douglas K. Baumgartner; Daniel D. Cameron; Glen N. Jones;
John W. Roberts, Members of the Board of Visitors of
Virginia Military Institute; VMI Foundation, Incorporated;
VMI Alumni Association, Defendants-Appellees,
and
Gordon K. Davies, Director of the Virginia State Council of
Higher Education; The Virginia State Council of
Higher Education and its Members and
Officers, Defendants.
Virginia Women Attorneys Association; Virginia Chapter of
the American Association of University Women; Virginia
Chapter of the Olderwomen's League; Virginia Federation of
Business and Professional Women's Clubs, Incorporated;
Friends of VMI for Equality; Alexander W. Astin; American
Civil Liberties Union; ACLU Foundation of Virginia;
National Women's Law Center; American Association of
University Women; Center for Women Policy Studies;
National Organization for Women; NOW Legal Defense and
Education Fund; Virginia National Organization for Women;
Virginia Now Legal Defense and Education Fund, Incorporated;
Women's Law Project; Women's Legal Defense Fund, Amici Curiae.
 No. 91-1690.
 United States Court of Appeals,
Fourth Circuit.
 Argued April 8, 1992.
Decided Oct. 5, 1992.
On Petition for Rehearing with Suggestion
for Rehearing In Banc Nov. 19, 1992.
 
 Jessica Dunsay Silver, Civil Rights Div., U.S. Dept. of Justice, Washington, D.C., argued (John R. Dunne, Asst. Atty. Gen., David O. Simon, Acting Deputy Asst. Atty. Gen., Thomas E. Chandler, on brief), for plaintiff-appellant.
 Robert H. Patterson, Jr., McGuire, Woods, Battle & Boothe, Richmond, Va., Griffin B. Bell, King & Spalding, Atlanta, Ga., argued (William G. Broaddus, Anne Marie Whittemore, J. William Boland, Frank B. Atkinson, H. Alexander Wise, McGuire, Woods, Battle & Boothe, Richmond, Va., William A. Clineburg, Jr., King & Spalding, Atlanta, Ga., William B. Poff, Woods, Rogers & Hazlegrove, Roanoke, Va., on brief), for defendants-appellees.
 Eileen N. Wagner, Richmond, Va., Karen R. Keesling, Falls Church, Va., Sylvia Clute, Richmond, Va., for amici curiae, Virginia Women Attys. Ass'n, Virginia Chapters of the American Ass'n of University Women, Older Women's League, Virginia Federation of Business and Professional Women's Clubs, Inc., Friends of VMI for Equality, Dr. Alexander W. Astin.
 Ellen J. Vargyas, Shirley Sagawa, Marcia D. Greenberger, National Women's Law Center, Washington, D.C., Joan E. Bertin, Elisabeth A. Werby, Isabelle Katz Pinzler, Jacqueline A. Berrien, American Civ. Liberties Union Foundation, New York City, Stephen B. Pershing, American Civ. Liberties Union Foundation of Virginia, Richmond, Va., for amici curiae, American Civil Liberties Union, ACLU Foundation of Virginia, National Women's Law Center, American Ass'n of University Women, Center for Women Policy Studies, National Organization for Women, NOW Legal Defense and Educ. Fund, Virginia NOW, Virginia NOW Legal Defense and Educ. Fund, Women's Law Project, Women's Legal Defense Fund.
 Before PHILLIPS and NIEMEYER, Circuit Judges, and WARD, Senior District Judge for the Middle District of North Carolina, sitting by designation.
 OPINION
 NIEMEYER, Circuit Judge:
 
 
 1
 The male-only admissions policy of Virginia Military Institute (VMI), a state institution of higher education located in Lexington, Virginia, is challenged by the federal government under the Equal Protection Clause of the Fourteenth Amendment and the jurisprudence of Mississippi Univ. for Women v. Hogan, 458 U.S. 718, 102 S.Ct. 3331, 73 L.Ed.2d 1090 (1982). The government contends that the school's policy discriminates against women and is not substantially related to the achievement of an important governmental objective.
 
 
 2
 Following a six-day trial and extensive findings of fact, the district court concluded that VMI's male-only policy "is fully justified" by a generally accepted benefit of single-sex education, and that the admission of women would "significantly" change the "methods of instruction and living conditions" at VMI. Having concluded that "diversity in education" was a legitimate state interest, the district court summarized, "I find that both VMI's single-sex status and its distinctive educational method represent legitimate contributions to diversity in the Virginia higher education system, and that excluding women is substantially related to this mission." 766 F.Supp. 1407, 1411-13 (W.D.Va.1991).
 
 
 3
 The United States contends on appeal that enhancing diversity by offering a distinctive single-sex education to men only is not a legitimate state objective and that the Commonwealth and VMI have not established a sufficient justification for VMI's male-only admissions policy.
 
 
 4
 For the reasons that we give more fully below, we accept the district court's factual determinations that VMI's unique methodology justifies a single-gender policy and material aspects of its essentially holistic system would be substantially changed by coeducation. Moreover, all parties appear to acknowledge, as did the district court, the positive and unique aspects of the program. The Commonwealth of Virginia has not, however, advanced any state policy by which it can justify its determination, under an announced policy of diversity, to afford VMI's unique type of program to men and not to women.
 
 
 5
 Because Virginia has failed to articulate an important objective which supports the provision of this unique educational opportunity to men only, we vacate the judgment of the district court and remand the case to the district court to require the Commonwealth of Virginia to formulate, adopt, and implement a plan that conforms to the principles of equal protection discussed herein. We do not, however, order that women be admitted to VMI if adequate alternatives are available.
 
 
 6
 * VMI was established by the Virginia legislature in 1839 as a four-year military college, and its graduates have distinguished themselves in the 150 years since. A VMI professor, Thomas "Stonewall" Jackson, achieved notoriety as a confederate general during the Civil War. The VMI cadet corps fought Union troops at New Market, Virginia, and almost 1800 alumni (constituting 94% of all VMI graduates at the time) fought in the Civil War. Among the thousands of alumni who have served this country during war is General of the Army George C. Marshall, and six have been awarded the Congressional Medal of Honor. VMI graduates have achieved similarly in civilian life. The school's success and reputation are uncontroverted in this case. Indeed, it is apparently that very success in producing leaders that has made admission to VMI desirable to some women, prompting the government to challenge the policy of excluding women.
 
 
 7
 VMI is financially supported by the Commonwealth of Virginia and remains "subject to the control of the [Virginia] General Assembly." Va.Code Ann. § 23-92. It is governed by a Board of Visitors, which the Commonwealth expressly charges with prescribing "the terms upon which cadets may be admitted, their number, the course of their instruction, the nature of their service, and the duration thereof." Va.Code Ann. § 23-104.
 
 
 8
 The 15 state-supported institutions of higher learning in Virginia,[1] including VMI, are generally supervised and coordinated by the State Council of Higher Education for Virginia. While the Virginia General Assembly assigns various responsibilities to the Council of Higher Education, including the responsibility "to review and approve or disapprove of any proposed change in [an existing institution's] statement of mission," it delegates to each institution the right to modify its mission and to establish admissions criteria. See Va.Code Ann. § 23-9.6:1(2).
 
 
 9
 The mission of VMI is to produce "citizen-soldiers, educated and honorable men who are suited for leadership in civilian life and who can provide military leadership when necessary."[2] Focusing primarily on character development and leadership training through a unique and intense process, characterized as an "adversative" educational model drawn from earlier military training and English public schools, VMI's educational method emphasizes physical rigor, mental stress, absolute equality of treatment, absence of privacy, minute regulation of behavior, and indoctrination of values. The process is designed to foster in VMI cadets doubts about previous beliefs and experiences and to instill in cadets new values which VMI seeks to impart. The model employs a hostile, spartan environment that is characterized by six interrelated components--the "rat line," the class system, the "dyke" system, the honor code, the barracks life, and the military system.
 
 
 10
 The rat line refers to the harsh orientation process to which all new cadets ("rats") are subjected during their first seven months at VMI. Designed to be comparable to the Marine Corps' boot camp in terms of physical rigor and mental stress, the rat line includes indoctrination, minute regulation of individual behavior, frequent punishments, rigorous physical education, and military drills. The class system entails the peer assignment of privileges and responsibilities, including supervisory roles, to classes of cadets based on rank. The dyke system, which is "closely linked" with the rat line, assigns each rat to a first classman, who acts as a mentor ("dyke") to relieve some of the stress generated from the rat line. The dyke system aims to create cross-class bonding and provide a model for leadership and support. The honor code, that a cadet "does not lie, cheat, steal nor tolerate those who do," is a stringently enforced code of conduct applying to all aspects of life at VMI and providing the single penalty of expulsion for its violation. The barracks life, described as important to VMI's ethos of egalitarianism, is dictated by the nature and functioning of the barracks. Each class is assigned to one floor of the four-story barracks structure and three to five cadets are assigned to a room. The rooms are stark and unattractive. There are no locks on the doors and windows are uncovered. Access to bathrooms is provided by outside corridors visible to the quadrangle, and there is a total lack of privacy in the barracks, where cadets are subjected to constant scrutiny and minute regulation, all intended to foster cadet equality and to induce stress. Finally, the military system, providing regulation, etiquette, and drill, pervades life at VMI. As part of the military system each cadet must participate in an ROTC program throughout his four years. The district court found that the various systems in place at VMI are integrated and interdependent, and several of them cannot be changed without materially affecting others.
 
 
 11
 VMI, with approximately 1,300 male students, has never accepted applications from women. During the two years preceding the filing of this action, it did, however, receive over 300 inquiries from women. Today, VMI is the only state-supported, single-sex college in Virginia, although historically most of Virginia's 15 public colleges were at one time single-sex institutions.
 
 
 12
 The government instituted this action on March 1, 1990, under Title IV of the Civil Rights Act of 1964, 42 U.S.C. § 2000c-6, on behalf of a female high school student who desired admission to VMI, contending that VMI's male-only admissions policy violates the Equal Protection Clause of the Fourteenth Amendment. The suit named as defendants the Commonwealth of Virginia; its governor, Lawrence Douglas Wilder; VMI and its Board of Visitors and top officers; and the State Council of Higher Education for Virginia, its members and its Director.[3] The action sought an order enjoining discrimination based on sex and requiring the defendants "to formulate, adopt, and fully and timely implement a plan to remedy fully their discriminatory policies and practices."
 
 
 13
 In his answer to the complaint, Governor Wilder stated that "the failure to admit females to [VMI] is against his personal philosophy," and "no person should be denied admittance to a state supported school because of his or her gender." On his assurance that he would "abide by the decision of the Court," Governor Wilder was given permission not to participate in the litigation.
 
 
 14
 As the result of Governor Wilder's position and because of the conflict between the Governor, the Commonwealth, and VMI, the Attorney General of Virginia was granted leave to withdraw from representation of any party. She stated in a letter to the Governor,
 
 
 15
 You have indicated that VMI's admission policy serves no legitimate public policy objective.... In the absence of a statute explicitly expressing the General Assembly's view on the policy issue, your statement of the Commonwealth policy is persuasive.
 
 
 16
 As a result, the Commonwealth obtained pro bono counsel, who then sought and obtained on behalf of the Commonwealth a stay of proceedings against it during the liability phase of litigation, on the condition that it abide by the court's liability determination. Accordingly, the Governor and the Commonwealth did not participate in the liability determinations, which by agreement include this appeal.
 
 II
 
 17
 The district court began its opinion by noting that in May 1864, during the Civil War, VMI cadets bravely fought Union troops at New Market, Virginia. The court continued, "the combatants have again confronted each other, but this time the venue is in this court." What was not said is that the outcome of each confrontation finds resolution in the Equal Protection Clause. When the Civil War was over, to assure the abolition of slavery and the federal government's supervision over that policy, all states, north and south, yielded substantial sovereignty to the federal government in the ratification of the Fourteenth Amendment, and every state for the first time was expressly directed by federal authority not to deny any person within the state's jurisdiction "equal protection of the laws." U.S. Const. amend. XIV, § 1. The government now relies on this clause to attack VMI's admissions policy.
 
 
 18
 The obvious appeal to fairness in requiring the equal application of law too often becomes entangled with generalized notions of equality as referred to in Lincoln's Gettysburg Address[4] and, before that, the Declaration of Independence,[5] and these generalizations tend to overwhelm the difficult task of deciding what is meant by equal protection. We recognize that all persons are in many important respects different and that they were created with differences, and it is not the goal of the Equal Protection Clause to attempt to make them the same. To apply law to different persons with a mind toward making them the same might result, among other things, in the unequal application of the law. Thus, no one suggests that equal protection of the laws requires that all laws apply to all persons without regard to actual differences. See Jenness v. Fortson, 403 U.S. 431, 442, 91 S.Ct. 1970, 1976, 29 L.Ed.2d 554 (1971) ("Sometimes the grossest discrimination can lie in treating things that are different as though they were actually alike....").
 
 
 19
 Thus, although it is established that the Fourteenth Amendment "does not deny to States the power to treat different classes of persons in different ways," Reed v. Reed, 404 U.S. 71, 75, 92 S.Ct. 251, 253, 30 L.Ed.2d 225 (1971), when a state regulation employs classifications, the defining criteria must have a "fair and substantial relation" to the objective of the regulation. Id. at 76, 92 S.Ct. at 254. An equal protection analysis, therefore, must determine initially whether the class of persons to which a state regulation applies is defined in a manner that fairly and substantially relates the class to the purpose of the regulation. But the appropriate inquiry cannot end there. To protect against unlawful discrimination the analysis must also address whether the regulation, itself, serves an adequate governmental purpose.
 
 
 20
 Because almost every action taken by the state can be characterized as involving some form of classification, ranging from the benign to the invidious, different sorts of classifications have led to different levels of scrutiny. A classification based on race or national origin or which affects fundamental rights secured by the Constitution, because it is deemed to be inherently suspect, is examined most closely and is justified only by a necessary relationship to a compelling state interest. See, e.g., Palmore v. Sidoti, 466 U.S. 429, 432-33, 104 S.Ct. 1879, 1881-82, 80 L.Ed.2d 421 (1984) (racial classification). On the other hand, other classifications, based, for example, on economic factors, need only be rationally related to a legitimate governmental interest. See, e.g., City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 439-40, 105 S.Ct. 3249, 3254-55, 87 L.Ed.2d 313 (1985). A classification based on sex requires some scrutiny more focused than that for economic classification. While classification by sex is not subjected to the same strict scrutiny as are classifications by race and national origin or which affect fundamental rights, the Supreme Court has developed an intermediate level of review for gender-based classifications. "To withstand intermediate scrutiny, a statutory classification must be substantially related to an important governmental objective." Clark v. Jeter, 486 U.S. 456, 461, 108 S.Ct. 1910, 1914, 100 L.Ed.2d 465 (1988) (emphasis added); see also Mississippi Univ. for Women v. Hogan, 58 U.S. 718, 724, 102 S.Ct. 3331, 3336, 73 L.Ed.2d 1090 (1982).
 
 
 21
 Accordingly, to conduct the appropriate Fourteenth Amendment analysis in this case, we must determine whether the state policy of excluding women from admission to VMI is substantially related to an important policy or objective of Virginia.
 
 III
 
 22
 VMI argues that its own admissions policy is the state's policy because the admissions policy is by statute delegated to each state institution. The code provisions establishing VMI provide that its Board of Visitors "shall prescribe the terms upon which cadets may be admitted, their number, the course of their instruction, the nature of their service, and the duration thereof." Va.Code Ann. § 23-104. And this delegation of admissions policy-making is confirmed by the language of Va.Code Ann. § 23-9.6:1(2), which provides that the Council of Higher Education is not empowered to affect "the standards and criteria for admission of any public institution, whether related to academic standards, residence or other criteria, it being the intention of this section that ... student admission policies shall remain a function of the individual institutions." VMI thus contends that its admissions policy becomes the state policy so that, as its admissions policy is justified by the mission of developing citizen soldiers, a legitimate and important state purpose is served.
 
 
 23
 To address VMI's argument, we must first decide whether VMI's male-only admissions policy, maintained pursuant to state-delegated authority, is a classification justified by a fair and substantial relationship with the institution's mission of developing citizen soldiers, and this in turn leads to an examination of whether VMI's mission would be materially altered by the admission of women.
 
 
 24
 Much of the debate between the parties relates to the physiological differences between men and women and the question of a woman's ability to perform and endure the physical training included in VMI's program. While it is agreed by the parties that some women can meet the physical standards now imposed on men, it is also agreed that a smaller percentage of women can do so. Based on evidence about the experience of the service academies and the Marine Corps, the district court was justified in finding that if women were to be admitted, VMI would have to convert to a dual-track physical training program in order to subject women to a program equal in effect to that of men, and that, as found by a study conducted at West Point, cadets of both sexes would nevertheless perceive the treatment of them as unequal, leading to jealousy and resentment.
 
 
 25
 All the parties also agree that men and women would and should be entitled to some degree of privacy, at least to the extent that men and women not, in all respects, be exposed to each other. While again there was much debate among the parties as to the changes that might be required to accommodate this at VMI with the admission of women, all agreed that some accommodation would be necessary.
 
 
 26
 Finally, the parties have debated extensively the effect of cross-sexual confrontations that the adversative program would produce. Testimony was received that the deliberate harassment that upperclassmen give to "rats" would play out differently when the upperclassman is of one sex and the "rat" another. While the government attributed the predicted effect of this as stereotyping, the evidence supported the district court's finding that cross-sexual confrontation and interaction introduces additional elements of stress and distraction which are not accommodated by VMI's methodology. The court relied on testimony by experts and similar such observations made in the West Point study.
 
 
 27
 The sum of the changes that could be expected prompted the district court to conclude that if VMI became coeducational, it would offer "neither males nor females the VMI education that now exists." The court observed that "equal treatment would necessarily give way to fair treatment, thus undermining egalitarianism," which is a critical characteristic that now pervades several aspects of VMI's methodology. And the record supports the district court's findings that at least these three aspects of VMI's program--physical training, the absence of privacy, and the adversative approach--would be materially affected by coeducation, leading to a substantial change in the egalitarian ethos that is a critical aspect of VMI's training.
 
 
 28
 The district court's conclusions that VMI's mission can be accomplished only in a single-gender environment and that changes necessary to accommodate coeducation would tear at the fabric of VMI's unique methodology are adequately supported. And the district court was not clearly erroneous in concluding that if a court were to require the admission of women to VMI to give them access to this unique methodology, the decision would deny those women the very opportunity they sought because the unique characteristics of VMI's program would be destroyed by coeducation. The Catch-22[6] is that women are denied the opportunity when excluded from VMI and cannot be given the opportunity by admitting them, because the change caused by their admission would destroy the opportunity.
 
 
 29
 It is not the maleness, as distinguished from femaleness, that provides justification for the program. It is the homogeneity of gender in the process, regardless of which sex is considered, that has been shown to be related to the essence of the education and training at VMI.
 
 
 30
 The argument by the government that VMI's existing program is maintained as the result of impermissible stereotyping and overly broad generalizations, without a more detailed analysis, might lead, if accepted, to a finding that would impose a conformity that common experience rejects. Men and women are different, and our knowledge about the differences, physiological and psychological, is becoming increasingly more sophisticated. Indeed the evidence in this case amply demonstrated that single-genderedness in education can be pedagogically justifiable.
 
 
 31
 For instance, in a ten-year empirical study reported by Alexander W. Astin in Four Critical Years: Effects of College on Beliefs, Attitudes, and Knowledge (San Francisco: Jossey-Bass 1977), it was found that single-sex colleges have advantages over coeducational colleges in numerous areas. A summary of the report provided by the parties in this case states:
 
 
 32
 Single-sex colleges show a pattern of effects on both sexes that is almost uniformly positive. Students of both sexes become more academically involved, interact with faculty frequently, show large increases in intellectual self-esteem, and are more satisfied with practically all aspects of college experience (the sole exception is social life) compared with their counterparts in coeducational institutions.
 
 
 33
 J.A. 1830. In addition to providing substantial benefits to college students, single-sex education also has been found to have salutary consequences for sexual equality in the job market. In a study conducted by Marvin Bressler and Peter Wendell, The Sex Composition of Selective Colleges and Gender Differences in Career Aspirations, 51 J. Higher Educ. 650, 662 (1980), the authors observed that in single-sex colleges, the students were more likely to set aside initial, stereotypical job aspirations in favor of more sex-neutral aspirations. They concluded from their data,
 
 
 34
 The available evidence thus fails to support the hypothesis that coeducation is a useful instrument for altering the imbalance in career aspirations of academically superior men and women undergraduates.
 
 
 35
 * * * * * *
 
 
 36
 [I]f all selective residential colleges reverted to single sex status, a notable fraction of all men and an even larger proportion of all women would probably renounce initial career commitments, a development which would have salutary consequences for sexual equality in the job market.
 
 
 37
 The experts for both sides in this case appear to agree with the conclusions reached in these studies.
 
 
 38
 Thus, while the data support a pedagogical justification for a single-sex education, they do not materially favor either sex. Both men and women appear to have benefited from single-sex education in a materially similar manner. The evidence about the VMI system suggests no differently. The problems that could be anticipated by coeducation at VMI, which are suggested by VMI generally to arise from physiological differences between men and women, needs for privacy, and cross-sexual confrontations, would not be anticipated in an all-female program with the same mission and methodology as that of VMI.[7]
 
 
 39
 In summary, the record supports the conclusion that single-sex education is pedagogically justifiable, and VMI's system, which the district court found to include a holistic formula of training, even more so. It is not remarkable therefore that the government in its brief conceded, "[I]t is not our position that the Fourteenth Amendment embodies a per se bar to public single-sex education."
 
 IV
 
 40
 While this conclusion answers the question of whether VMI's male-only policy is justified by its institutional mission, the argument does not answer the larger question of whether the unique benefit offered by VMI's type of education can be denied to women by the state under a policy of diversity, which has been advanced as the justification and which was relied on by the district court.
 
 
 41
 The parties agree that VMI offers a unique combination of education and training that makes a positive contribution offered by no other institution.[8] And the district court found, apparently without exception from any party, that "VMI's military program is absolutely unique. No other school in Virginia or in the United States, public or private, offers the same kind of rigorous military training as is available at VMI." The decisive question in this case therefore transforms to one of why the Commonwealth of Virginia offers the opportunity only to men. While VMI's institutional mission justifies a single-sex program, the Commonwealth of Virginia has not revealed a policy that explains why it offers the unique benefit of VMI's type of education and training to men and not to women. Although it is readily apparent from the evidence that the rigor of the physical training at VMI is tailored to males, in the context of a single-sex female institution, it could be adjusted without detrimental effect. No other aspect of the program has been shown to depend upon maleness rather than single-genderedness.
 
 
 42
 Virginia has committed the development of its educational policy in the first instance to the State Council of Higher Education for Virginia, but affords each institution of higher learning significant autonomy. See Va.Code Ann. § 23-9.6:1. Moreover, a specific statute reserves control over VMI in the General Assembly. See Va.Code Ann. § 23-92. To oversee and coordinate the several state-supported institutions of higher education, however, the Council of Higher Education is charged with the responsibility of preparing plans, which it has done biennially. These plans articulate "access, excellence and accountability" as an overriding goal of Virginia's system of higher education, and they reaffirm a policy of autonomy and diversity to provide a variety of choice. The Council's plans also urged a continuing effort of coordination among the state's public and private institutions to avoid duplication and expense.
 
 
 43
 Announcing a similar policy, a special commission legislatively established to chart the future goals of higher education in Virginia, the Commission on the University of the 21st Century, reported to the Governor and the General Assembly of Virginia in 1990 that the hallmarks of Virginia higher education, "autonomy and diversity," should be maintained. Within its report, the Commission indirectly reaffirmed the earlier stated policy of affording broad access to higher education in Virginia, and also observed:
 
 
 44
 Because colleges and universities provide opportunities for students to develop values and learn from role models, it is extremely important that they deal with faculty, staff, and students without regard to sex, race, or ethnic origin.
 
 
 45
 (Emphasis added.) That statement is the only explicit one that we have found in the record in which the Commonwealth has expressed itself with respect to gender distinctions. Our inability to find a stated policy justifying single-sex education in state-supported colleges and universities is confirmed by the Virginia Attorney General's statement about the absence of such a state policy: "In the absence of a statute explicitly expressing the General Assembly's view on the policy issue, [the Governor's] statement of the Commonwealth's policy [that 'no person should be denied admittance to a State supported school because of his or her gender'] is persuasive." (Emphasis added.)
 
 
 46
 The lack of a state-announced policy to justify gender classifications is aggravated by the reluctance of the Commonwealth, as a party, and its governor to participate in this case and in this appeal. To the extent that the Governor's view represents state policy, VMI's single-sex admissions policy violates state policy.
 
 
 47
 If VMI's male-only admissions policy is in furtherance of a state policy of "diversity," the explanation of how the policy is furthered by affording a unique educational benefit only to males is lacking. A policy of diversity which aims to provide an array of educational opportunities, including single-gender institutions, must do more than favor one gender. Moreover, if responsibility for implementing diversity has somehow been delegated to an individual institution, no explanation is apparent as to how one institution with autonomy, but with no authority over any other state institution, can give effect to a state policy of diversity among institutions.
 
 
 48
 On a more empirical level, we have been given no explanation for the movement away from gender diversity in Virginia by public colleges and universities. At one time most of Virginia's institutions of higher learning were single-sex, including four all-female institutions. Today, all but VMI are coeducational. If VMI thus remains male in furtherance of the state's policy of diversity, which includes diversity in gender, did the decisions of the other institutions violate state policy by moving uniformly to coeducation? At most, VMI could argue that the policy of institutional autonomy in establishing admissions requirements produces a diversity by virtue of the individual random decisions of its 15 institutions. But that randomness has fortuitously resulted in 14 coeducational institutions and VMI, an all-male institution.
 
 
 49
 In short, VMI has adequately defended a single-gender education and training program to produce "citizen soldiers," but it has not adequately explained how the maintenance of one single-gender institution gives effect to, or establishes the existence of, the governmental objective advanced to support VMI's admissions policy, a desire for educational diversity.
 
 V
 
 50
 We are thus left with three conclusions: (1) single-gender education, and VMI's program in particular, is justified by a legitimate and relevant institutional mission which favors neither sex; (2) the introduction of women at VMI will materially alter the very program in which women seek to partake; and (3) the Commonwealth of Virginia, despite its announced policy of diversity, has failed to articulate an important policy that substantially supports offering the unique benefits of a VMI-type of education to men and not to women.
 
 
 51
 Although neither the goal of producing citizen soldiers nor VMI's implementing methodology is inherently unsuitable to women, the Commonwealth has elected, through delegation or inaction, to maintain a system of education which offers the program only to men. In the proceedings below, Virginia had the opportunity to meet its burden of demonstrating that it had made an important and meaningful distinction in perpetuating this condition. See Kirchberg v. Feenstra, 450 U.S. 455, 461, 101 S.Ct. 1195, 1199, 67 L.Ed.2d 428 (1981). As the record stands, however, evidence of a legitimate and substantial state purpose is lacking.
 
 
 52
 In light of our conclusions and the generally recognized benefit that VMI provides, we do not order that women be admitted to VMI if alternatives are available. But VMI's continued status as a state institution is conditioned on the Commonwealth's satisfactorily addressing the findings we affirm and bringing the circumstances into conformity with the Equal Protection Clause of the Fourteenth Amendment. By commenting on the potential benefits of single-gender education while discussing the alleged governmental interest in support of VMI's admissions policies, we do not mean to suggest the specific remedial course that the Commonwealth should or must follow hereafter. Rather, we remand the case to the district court to give to the Commonwealth the responsibility to select a course it chooses, so long as the guarantees of the Fourteenth Amendment are satisfied. Consistent therewith, the Commonwealth might properly decide to admit women to VMI and adjust the program to implement that choice, or it might establish parallel institutions or parallel programs, or it might abandon state support of VMI, leaving VMI the option to pursue its own policies as a private institution. While it is not ours to determine, there might be other more creative options or combinations.
 
 
 53
 Accordingly, we vacate the judgment and remand the case to the district court: (1) to require the defendants to formulate, adopt, and implement a plan that conforms with the Equal Protection Clause of the Fourteenth Amendment, (2) to establish appropriate timetables, and (3) to oversee the implementation of the plan.
 
 
 54
 VACATED AND REMANDED FOR FURTHER PROCEEDINGS.
 
 
 55
 On Petition for Rehearing with Suggestion for Rehearing In Banc
 
 
 56
 Nov. 19, 1992.
 
 
 57
 Appellees filed a petition for rehearing with suggestion for rehearing in banc and appellant filed an answer to the petition. A member of the Court requested a poll on the suggestion for rehearing in banc, and a majority of the judges voted to deny rehearing in banc. Judges Widener and Hamilton voted to rehear the case in banc, and Chief Judge Ervin and Judges Russell, Hall, Phillips, Murnaghan, Wilkins, Niemeyer, and Williams voted to deny a rehearing in banc. Judges Wilkinson and Luttig did not participate in the decision.
 
 
 58
 The original judicial panel voted to deny the petition for rehearing.
 
 
 59
 The Court denies the petition for rehearing with suggestion for rehearing in banc.
 
 
 60
 Entered at the direction of Judge Niemeyer, with the concurrence of Judge Phillips and Judge Ward, Senior United States District Judge, sitting by designation.
 
 
 
 [1]
 In addition to VMI, the list includes: Christopher Newport College, Clinch Valley College, The College of William and Mary, George Mason University, James Madison University, Longwood College, Mary Washington College, Norfolk State University, Old Dominion University, Radford University, University of Virginia, Virginia Commonwealth University, Virginia Polytechnic Institute and State University, and Virginia State University
 
 
 [2]
 As stated in the final report of the Mission Study Committee of the VMI Board of Visitors, dated May 16, 1986:
 The Virginia Military Institute believes that the measure of a college lies in the quality and performance of its graduates and their contributions to society.
 Therefore, it is the mission of the Virginia Military Institute to produce educated and honorable men, prepared for the varied work of civil life, imbued with love of learning, confident in the functions and attitudes of leadership, possessing a high sense of public service, advocates of the American Democracy and free enterprise system, and ready as citizen-soldiers to defend their country in time of national peril.
 To accomplish this result, the Virginia Military Institute shall provide to qualified young men undergraduate education of highest quality--embracing engineering, science, and the arts--conducted in, and facilitated by, the unique VMI system of military discipline.
 
 
 [3]
 The VMI Foundation, Inc., and the VMI Alumni Association, neither of which is a state agency, were allowed to participate in the litigation as intervenors
 
 
 [4]
 "Four score and seven years ago, our fathers brought forth upon this continent a new nation, conceived in liberty and dedicated to the proposition that all men are created equal."
 
 
 [5]
 "We hold these Truths to be self-evident, that all Men are created equal."
 
 
 [6]
 From the paradoxical rule found in the novel, Catch-22, by Joseph Heller (1961)
 
 
 [7]
 We do not intend to imply that separate, single-sex institutions or programs are "equal" to coeducational ones for equal protection purposes. But, to the contrary, the data suggest that differences between a single-gender student population and a coeducational one justify a state's offering single-gender education
 
 
 [8]
 At one point VMI suggested that a similar educational opportunity was provided to women by the program at Virginia Polytechnic Institute and State University. It has not pressed that point and in its brief confirms that VMI's program is "unique and remarkably successful." Similarly the government characterized VMI's program as "distinctive" and "not available anywhere else in Virginia."