Shannon Richey FAULKNER, Individually and on behalf of all others similarly situated, Plaintiff,

and

the United States of America, Plaintiff–Intervenor,

v.

James E. JONES, Jr., Chairman, Board of Visitors of the Citadel, the Military College of South Carolina, Carroll A. Campbell, Governor of the State of South Carolina, T. Eston Marchant, Adjutant General of the State of South Carolina, Barbara S. Nielsen, Superintendent of Education of the State of South Carolina, William F. Prioleau, Jr., William E. Jenkinson, III, Leonard C. Fulghum, Jr., James M. Leland, Jr., John A. McAllister, Jr., David S. Boyd, Jr., Julian G. Frasier, III, James W. Bradin, Larry J. Ferguson, and Steven D. Peper, Members of the Board of Visitors of the Citadel, the Military College of South Carolina, Wallace I. West, Jr., Director of Admissions and Recruiting at the Citadel, the Military College of South Carolina, Claudius E. Watts, III, President of the Citadel, the Military College of South Carolina, in their official capacities, Defendants,

and

the State of South Carolina, The Citadel, the Military College of South Carolina, and the Board of Visitors of the Citadel, The Military College of South Carolina, Added Defendants.

Civ. A. No. 2:93–488–2.

United States District Court,
D. South Carolina,
Charleston Division.

July 22, 1994.

Robert Ray Black, Charleston, SC, Suzanne Elizabeth Coe, Greenville, SC, Henry Weisburg, Valorie K. Vojdik, Shearman & Sterling, New York City, Sara L. Mandelbaum, American Civ. Liberties Union, Thomas F. Swift, Mary K. Warren, Shearman & Sterling, New York City, for Shannon Richey Faulkner.

Nathaniel Douglas, Sandra Lynn Beber, Janet Reno, James P. Turner, Nathaniel Douglas, Chief, U.S. Dept. of Justice, Civ.

Rights Div., Educational Opportunities Litigation Section, Washington, DC, for U.S.

Morris Dawes Cooke, Jr., Barnwell, Whaley, Patterson & Helms, Charleston, SC, Robert H. Patterson, Anne Marie Wittemore, McGuire, Woods, Battle & Boothe, Richmond, VA, Dwight J. Davis, Griffin B. Bell, William Clineburg, King & Spalding, Atlanta, GA, for James E. Jones, Jr.

Morris Dawes Cooke, Jr., Barnwell, Whaley, Patterson & Helms, Charleston, SC, for Carroll A. Campbell, Jr., T. Eston Marchant, Barbara S. Nielsen, William F. Prioleau, Jr., William E. Jenkinson, III, Leonard C. Fulghum, Jr., James M. Leland, Jr., John A. McAllister, Jr., David S. Boyd, Jr., Julian G. Frasier, III, James W. Bradin, Larry J. Ferguson, Steven D. Peper, Wallace I. West, Jr., and Claudius E. Watts, III.

Margaret Allison Snead, Joseph C. Wilson, IV, Hood Law Firm, Robert H. Hood, Robert H. Hood & Associates, Charleston, SC, for State of S.C.

Frank B. Atkinson, McGuire, Woods, Battle & Boothe, Richmond, VA, for The Citadel, The Military College of S.C., and The Bd. of Visitors of the Citadel, The Military College of S.C.

## FINDINGS OF FACT CONCLUSIONS OF LAW AND ORDER

HOUCK, Chief Judge.

The Citadel, the Military College of South Carolina, was established by the State of South Carolina in 1842. Since that time the school's primary mission has been "to educate male undergraduates as members of the South Carolina Corps of Cadets (Corps or Corps of Cadets) and to prepare them for post-graduate positions of leadership through academic programs of recognized excellence supported by the best features of a disciplined military environment."[1] No women have ever been admitted to the Corps of Cadets, and Shannon Richey Faulkner (Faulkner) is the first of her sex to have her application processed. Her application to be admitted to the Corps in the Fall of 1993 was initially accepted, but then rejected when The Citadel learned that she is a woman. The plaintiff on March 2, 1993, then instituted this action against the members of the Board of Visitors of The Citadel, Wallace I. West, Jr., Director of Admissions and Recruiting at The Citadel, and Claudius E. Watts, III, President of The Citadel, claiming that the males only admission policy of The Citadel denies her equal protection of the laws guaranteed by the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. In her complaint Faulkner seeks a permanent injunction against the defendants from discriminating against her on the basis of sex and requiring her immediate admission to The Citadel's Corps of Cadets.

On June 7, 1993, the United States of America was permitted to intervene as a plaintiff, and the State of South Carolina, The Citadel, and The Citadel's Board of Visitors were added as defendants. The government also challenges the failure of The Citadel to admit women to the Corps and asks that said practice be enjoined so that all qualified women will be allowed to be members of the Corps of Cadets.

At the same time this action was getting underway, there was pending in the United States District Court for the Western District of Virginia a closely related case instituted by the United States of America against Virginia Military Institute. Virginia Military Institute is also a public institution of higher learning open only to males whose primary mission and educational methods are almost identical to The Citadel's, and the government's suit against that institution challenged the constitutionality of its males only admission policy and raised the identical issues presented in the instant litigation.[2] In

1. Bulletin of The Citadel, Catalogue Issue 1993–1994, p. 12.

2. It now appears that the only important difference between the two cases is that in this one we have a real, live plaintiff who, but for her sex, would probably be a member of the Corps of Cadets. In the case against the Virginia Military Institute the government is the only plaintiff.

deciding *VMI*[3] the Fourth Circuit Court of Appeals reached the following conclusions:

(1) single-gender education, and VMI's program in particular, is justified by a legitimate and relevant institutional mission which favors neither sex;

(2) the introduction of women at VMI will materially alter the very program in which women seek to partake; and

(3) the Commonwealth of Virginia, despite its announced policy of diversity, has failed to articulate an important policy that substantially supports offering the unique benefits of a VMI-type of education to men and not to women.

*VMI*, 976 F.2d at 899. The Fourth Circuit then remanded the case to the district court so that it could "require the defendants to formulate, adopt, and implement a plan that conforms with the Equal Protection Clause of the Fourteenth Amendment." *Id.* at 900.

On May 28, 1993, the plaintiffs filed a motion for summary judgment in this action. In that motion they claimed, in essence, that the law of *VMI* applied to this case and that discovery had established without question that the only way the defendants can remedy the violation of Faulkner's constitutional rights is to admit her to the Corps of Cadets. The plaintiffs, therefore, ask that the court issue an order requiring the defendants to admit Faulkner to the Corps without delay.

In response to said motion the defendants agree that *VMI* applies to this case, but they claim that, unlike Virginia, South Carolina can justify the all male admissions policy of The Citadel by articulating an important policy that substantially supports offering the unique benefits of a Citadel-type education to men and not to women.[4] The defendants, therefore, argue that Faulkner's constitutional rights have not been violated and no remedial action is necessary.

3. *U.S. v. Commonwealth of Va.*, 976 F.2d 890 (4th Cir.1992) (*VMI*).

4. The articulation of such a policy, for the sake of brevity, has been called "justification" by the court and attorneys in this matter and may from time to time be referred to in such a manner herein.

5. By accepting the holdings of *VMI* as we do herein, we give the defendants the benefit of the

In light of this, the court saw no reason to retry all of the issues addressed in *VMI*. Instead, it chose to try only justification, the only issue that the defendants claim separates them from *VMI*, and remedy, the only issue that remains if *VMI* does apply.[5]

The trial of those two issues commenced on May 16, 1994, and concluded on May 27, 1994. Subsequently, the parties filed their final briefs and other supporting documents with the court and final arguments were heard. The court has now given careful consideration to the trial evidence and all other matters appropriately before it and pursuant to Rule 52 of the Federal Rules of Civil Procedure now publishes the following Findings of Fact and Conclusions of Law.

## *FINDINGS OF FACT*

1. Faulkner is a 19 year old female who is a resident and citizen of the State of South Carolina. Her home is in Powdersville, South Carolina, where she attended Wren High School and was a 1993 honor graduate. In January 1993, Faulkner applied to be admitted to the Corps of Cadets at The Citadel. She was thereafter advised by Citadel officials that her application had been provisionally accepted and that full acceptance was contingent upon her completion of all high school courses and the submission of a final high school transcript and certain medical and drug testing information. On February 10, 1993, The Citadel wrote Faulkner a letter revoking its acceptance of her application and advising her that she would not be admitted to the Corps of Cadets because of her sex.

2. The defendants admit that, except for her sex, Faulkner is qualified to be a member of the Corps of Cadets.

doubt. We find that proper in considering the plaintiffs' motion for summary judgment, but it should be clearly noted that this does not preclude the plaintiffs from raising all of the *VMI* holdings herein accepted and retrying the same if this order is reversed or if the same is otherwise warranted. The plaintiffs accept *VMI only* for purposes of their motion for summary judgment.

3. There are twelve public colleges and universities in South Carolina offering four-year degree programs. These institutions are separate and distinct institutions with each having a separate board of trustees or visitors. The University of South Carolina also maintains five two-year regional campuses, and the State of South Carolina provides fifteen public technical colleges within the state.

4. The public institutions of higher learning in South Carolina are located throughout the state, and all citizens of the state have easy and convenient access to one or more institutions. There is considerable duplication in program offerings among the public institutions, but each has its unique features, and the diversity between the institutions and their locations makes each a different experience.

5. All of the institutions of higher education maintained by the State of South Carolina are coeducational except The Citadel. Only Winthrop University and Clemson University have been single-gender institutions in the past fifty years.

Clemson University was founded in 1889 as a land grant college. It was originally an all-male agricultural and military school, but in 1955 Clemson's Board of Trustees voted to drop its military component and become coeducational. It has remained coeducational since that time. There is no indication that single-sex education as such played any role in Clemson becoming coeducational. That decision resulted from the realization by the Clemson Board of Trustees that the school would not grow with the State of South Carolina and adequately serve the educational needs of its citizens if it remained a single-sex military college.

Winthrop University was first established in Columbia, South Carolina, by Dr. David Bancroft Johnson as the Winthrop Training School for Teachers in 1886. In 1891 it became a public state supported college known as the South Carolina Industrial and Winthrop Normal College. In 1895 the institution was moved to its present location in Rock Hill, South Carolina, and in 1920 its name was changed to Winthrop College, the South Carolina College for Women. Its charter from the State of South Carolina permitted the admission of women only, and it did not become coeducational until 1974. One of the reasons the Winthrop Board of Trustees chose to become coeducational was its declining enrollment. There is, however, no evidence in the record to support a conclusion that Winthrop University could not have survived as a single-sex female institution. In fact, there is no indication that the need or value of single-sex education for women was even considered in the decision making process. Clearly, Winthrop University did not become coeducational to discriminate against women. The primary reason behind Winthrop University going coeducational was the desire of its Board of Trustees to better serve the educational needs of the citizens of South Carolina and particularly those within its geographical area by providing better programs, better faculty and better facilities.

6. The Citadel, the Military College of South Carolina, was established by an Act of the General Assembly in 1842. The Citadel originally occupied the old state arsenal, named the Citadel, on Marion Square in the City of Charleston but moved to its present site on the Ashley River in 1922.

The unique feature of The Citadel is the requirement that all undergraduate day students be members of the South Carolina Corps of Cadets, subject to military discipline at all times, and enrolled in programs of study which qualify graduates for commissions in the active or reserve armed forces. The Citadel is also unique in that it is the only public institution in South Carolina which offers single-gender education to its students by admitting only males to its Corps of Cadets. The type of education available at The Citadel is not available at any other institution in South Carolina.

The primary mission of The Citadel is to "educate male undergraduates as members of the South Carolina Corps of Cadets and to prepare them for post-graduate positions of leadership through academic programs of recognized excellence supported by the best features of a disciplined military environment." Bulletin of The Citadel, Catalogue

Issue 1993–1994, p. 12. The purpose of The Citadel's military environment is "to provide the best qualities of a military and disciplined environment to support the growth and development of character, physical fitness and moral and spiritual principles, thereby preparing its students to meet the requirements of citizens and especially of leaders." *Id.* at 13.

In its day program, The Citadel offers a comprehensive range of baccalaureate degree programs including those in the humanities, the natural and social sciences, and letters and professional degrees in education. The Citadel also offers the only baccalaureate degree in engineering in the low country of South Carolina. Only members of the Corps of Cadets may participate in the day program.

The Citadel accepts transfer students into its Corps of Cadets. Students transferring into the Corps of Cadets may do so as late as the first semester of their junior year.[6] Those students transferring into the Corps of Cadets must complete a full year in the Fourth Class System regardless of the number of academic credits transferred.

The Citadel offers a coeducational night program offering baccalaureate degrees in some, but not all, of the areas offered through its day program. Members of the Corps of Cadets are not permitted to take part in the night program. The night program at The Citadel has no military component. The Citadel offers coeducational day and night summer programs, but The Citadel's Corps of Cadets is not operational during the summer programs.

While ultimate authority for The Citadel rests with the South Carolina General Assembly, the Legislature has delegated authority to The Citadel's Board of Visitors to decide the institution's admission policy.

The Citadel's Board of Visitors consists of eleven people. In addition, Governor Carroll A. Campbell, Jr., Adjutant General T. Eston Marchant, and State Superintendent of Education Barbara S. Nielsen are all Ex–Officio members of The Citadel's Board of Visitors.

The Citadel's Board of Visitors is comprised completely of alumni who were members of the Corps. The South Carolina Attorney General issued an opinion in 1990 wherein he ruled women graduates of The Citadel's night program were eligible for membership on the institution's Board of Visitors. 1990 Op.Atty.Gen. No. 90–18. Currently there are no women on The Citadel's Board of Visitors, and no women have ever served on The Citadel's Board of Visitors.

7. When Winthrop University and Clemson University were single-sex institutions, the State of South Carolina funded them. Likewise, throughout its history as an institution that admits only males to its Corps of Cadets, The Citadel is supported primarily by the taxpayers of South Carolina.

8. There are also approximately twenty four-year private colleges in South Carolina. All of those institutions are coeducational except two. Converse College in Spartanburg, South Carolina, and Columbia College in Columbia, South Carolina, admit only women.

9. South Carolina has a tuition grants program which provides money to male and female students who meet certain requirements and choose to attend a private institution of higher learning within the State of South Carolina. In addition to certain minimal requirements, the Commission on Tuition Grants adjusts the amount of grant based on need, parental income and other scholarships received. Of the Six Hundred Fifty Million ($650,000,000.00) Dollars appropriated by the State of South Carolina in 1993 for higher education, Seventeen Million ($17,000,000.00) Dollars was awarded in tuition grants. South Carolina does not directly give tuition grant money to the private institutions. The tuition grants are awarded to the individual and not to the private

---

**6.** "To be eligible for graduation, all students, including transfer students from other colleges, are required to earn at The Citadel a minimum of one-half the semester hours prescribed for the major course of study." Defendant's Exhibit 226, p. 26. In addition, all students in the Corps of Cadets must complete a ROTC course every semester in which he is enrolled in the Corps or for eight semesters to be eligible for graduation. Defendant's Exhibit 226, p. 27. These requirements cannot successfully be completed beyond the first semester of the junior year.

schools. Six thousand six hundred and six students received such grants in the average amount of Two Thousand Five Hundred Twenty-nine ($2,529.00) Dollars in 1993.

10. The South Carolina State Commission on Higher Education (Commission) is charged with the duty of evaluating the State's institutions of higher learning with regard to those schools' short-term and long-term goals. As explained by the chairman of the Commission on Higher Education, Robert C. Gallager, the Commission is a coordinating board, not a governing board. Its charge is to approve individual institutional budgets or lump sum appropriations and make recommendations for appropriations to the South Carolina General Assembly. The Commission also approves all institutional facilities regardless of where the funding for them comes from and all programs which are added or deleted.

In 1979 the Commission did a Master Plan for Higher Education in South Carolina (Master Plan). The primary goal for post-secondary education in South Carolina as established by the 1979 Master Plan is to "provide the opportunity for learning beyond the secondary school level for all who need or seek it." Defendant's Exhibit 420A, p. 209. In order to accomplish that goal, the Commission recognized a need for an "appropriate diversity of programs to meet a wide range of needs." *Id.* Additionally, the Commission recognized a need for planning to "assure optimum use of the public's resources available" for post-secondary education. *Id.*

Other goals of the Commission as established in its 1979 Master Plan are as follows:

a. To provide the opportunity for learning beyond the secondary Level for all who need or seek it;

b. To reduce socio-economic barriers to post-secondary education;

c. To assure the most effective and efficient use of all resources;

d. To improve the quality of post-secondary education;

e. To encourage research activity within post-secondary education;

f. To make better use of the resources of post-secondary education in public service;

g. To achieve and sustain among the citizens of the state an appreciation for the accomplishments of post-secondary education and an understanding of its commitment to improving the quality of life;

h. To preserve a strong non-public sector of post-secondary education; and

i. To work cooperatively with all segments of education.

*Id.* at 248–250.

The Commission has published follow-up reports to its Master Plan annually since 1979 wherein the Commission follows South Carolina's progress in attaining the goals established in 1979.

The Commission also published a Program for Access and Equity in South Carolina Higher Education in 1988 at which time it reaffirmed South Carolina's commitment to "the full participation of all citizens in higher education on an equitable basis." Government's Exhibit 69, p. i. The program for access and equity was designed predominately to deal with the underrepresentation of African–Americans in higher education in South Carolina, but it goes without saying that the goals of the program are equally applicable to women. One of the basic concepts of South Carolina's system of higher education is autonomy and independence of individual institutions. As part of this autonomy, each institution's board of trustees is charged with developing the institution's mission and admission policy. The Commission recognizes the need for each institution to continue to have autonomy in mission selection and admission policies but recommended that the two should remain consistent. While the public institutions in South Carolina are given autonomy to choose their missions and admission policies, the Commission is charged with overseeing that the system works cohesively. As a part of that duty, the Commission has set a goal to include "an appropriate diversity of programs to meet a wide range of needs...." Defendant's Exhibit 420A, p. 209. The Commission has also focused its attention on planning so that the system of higher education

uses the public's resources in the optimum way.

11. At one time the State of South Carolina required that only women be admitted to Winthrop. Otherwise, however, the South Carolina General Assembly has played no active role in deciding the missions of the individual institutions in this state. It does, however, control them in the sense that the South Carolina General Assembly elects their governing bodies and controls the purse strings that permit them to survive.[7]

12. Diversity as the term refers to post-secondary education in South Carolina refers to diversity of educational programs or different kinds and types of programs, including two-year programs versus four-year programs and single-gender versus coeducational. In compliance with this policy of diversity, South Carolina has established a variety of diverse educational post-secondary institution ranging from small colleges to large regional universities, from liberal arts programs to specific research-based programs, from two-year institutions to four-year institutions with no graduate programs to four-year institutions with comprehensive graduate and professional schools. Diversity of education in South Carolina also refers to geographical location of the individual institutions, including rural versus urban campuses and small versus large campuses. With institutions located in all areas of the State South Carolina accomplishes its goal of making higher education convenient to all of its citizens.

13. The allocation of the state's resources for higher education has always been an issue of concern for the South Carolina General Assembly. The South Carolina General Assembly seeks to get the maximum benefit in education for its dollars. As a result, the state has tried to implement educational programs as the demand for such programs arises. The demand for certain programs in South Carolina is determined in various ways, including a need to fill vacancies in certain job areas or a large amount of interest in certain programs which the institution learns about and conveys to the Commission. The Commission has no mechanisms itself for determining the demand by its citizens for a particular program.

Demand is not the sole criterion for implementing new programs in South Carolina. Necessity for certain programs is sometimes substituted for demand. In addition, South Carolina has also attempted to allocate resources effectively by entering into compact arrangements with other states for certain programs such as veterinary medicine and optometry not offered to any students in this state. South Carolina is also a member of the Academic Common Market which fills the needs of certain students who seek other unique courses of study not offered to any students in this state.

14. On May 20, 1993, the South Carolina General Assembly adopted Concurrent Resolution 4170 (Concurrent Resolution or Resolution).[8] Prior to the 1993 Concurrent Resolution[9] there were no official governmental

---

7. Clemson is somewhat different in the way its governing body is selected, but that does not diminish the state's control of that institution.

8. At that time the *VMI* decision had been rendered by the Fourth Circuit Court of Appeals. At least two prominent Citadel alumni had contacted the Speaker of the South Carolina House of Representatives and furnished him a copy of what later became Concurrent Resolution 4170. The conclusion is inescapable that the said Concurrent Resolution was prompted by this litigation and would not have been passed had it not been for this litigation and the Fourth Circuit's decision in *VMI*.

9. The Fourth Circuit Court of Appeals had the following to say about the Concurrent Resolution of 1993 in *Faulkner v. Jones,* 10 F.3d 226, 232 (4th Cir.1993):

A resolution adopted in May 1993 by both houses of the legislature embraced all the positive contributions of The Citadel and reaffirmed a policy of providing its benefits only to males.

While the announced South Carolina policy reaffirms The Citadel's positive contributions, it does not connect these values to a male-only characteristic. Rather, the values stated in the resolution would appear to relate to a single-gender policy for institutions. The resolution also offers no explanation for the failure to offer women the same opportunity to participate in a single-gender institution and achieve similar goals as that afforded to men at The Citadel. Although South Carolina has appointed a committee to review the absence of opportunity for women, the committee will not report to the legislature until January 1994.

statements articulating a policy supporting single-gender education in South Carolina. In that Resolution, however, the State of South Carolina attempts to do just that. It expresses a policy of diversity in education which includes single-sex institutions where there is sufficient demand to support the same, and the governing body of the institution in question desires to implement single-sex programs. The Resolution also creates a committee of ten members "to assist the State of South Carolina in carrying out its responsibilities of providing single-gender educational opportunities for women, and the committee shall formulate recommendations for the South Carolina General Assembly to consider in exploring alternatives for the provision of single-gender educational opportunities for women." It further provides that the committee submit its report to the South Carolina General Assembly at the beginning of the 1994 Session at which time the committee shall be dissolved.

15. The committee called for in the Concurrent Resolution was appointed, organized and met on four occasions. It made its report to the South Carolina General Assembly in January 1994. In that report the committee did not offer the South Carolina General Assembly any definite plan for single-gender opportunities for women in South Carolina. Instead, it offered a list of possible alternatives. Those alternatives considered by the committee were a new public institution for women in South Carolina, a "women's college" within a larger university, a compact arrangement with Mary Baldwin College in Virginia or with Converse College or Columbia College in South Carolina, and an increase in the tuition grants program to provide more money for women to attend single-gender private institutions.

The committee did not recommend any particular alternative to the General Assembly and made no effort to determine the cost, the feasibility, or the constitutionality of any of the suggested alternatives. There is no indication that the committee contacted Mary Baldwin College or Converse College about the possibility of a compact arrangement with those institutions. Columbia College advised the committee that it was not interested in such an arrangement.

Though the committee made its report to the General Assembly at the beginning of the 1994 session there is nothing in the record to suggest that the General Assembly gave further consideration to the matter during its 1994 session.

16. It is and has been the policy of the State of South Carolina to provide educational opportunities in its system of higher education when dictated by its policies of responding to reasonable demand, student choice, institutional autonomy, diversity, and economy of resources.

17. In the fall of 1993 there were 32,642 women and 22,831 men enrolled in public institutions of higher education in the State of South Carolina. Approximately 2000 of those students, all male, attended The Citadel, while all others attended coeducational institutions.

The Citadel does not recruit women for the Corps of Cadets and has not through the years kept records for how many women have expressed an interest in attending the institution. In addition, no survey has been conducted to determine how many women are interested in joining the Corps of Cadets or how many women would be interested in pursuing a public single-sex education. In the past year, however, forty-three women have inquired about The Citadel's Corps of Cadets, but the seriousness of their interest has not been determined.

There does not appear to be any substantial interest in South Carolina for the establishment of an all-female military institution like The Citadel. The interest of South Carolina women in attending a Mary Baldwin-type program is unknown. Based on the experiences had at other coeducational military institutions, The Citadel would attract between twenty and fifty women annually to its Corps of Cadets if it were to become coeducational.

18. The remedial plan tendered by the defendants in the trial of this case sets forth "the remedial options from which they would expect to select and develop a more specific plan to cure any constitutional deficiency in

the South Carolina system of higher education, if one should ultimately be found." Defendant's Exhibit 422, p. 2. It does not select any one remedy or even prioritize those suggested. They simply say that "within sixty days of the court's determination of the liability issues, the Defendants will supplement this Remedial Plan by setting forth a specific proposed remedy that responds to the liability determination." *Id.* at p. 8. The specific proposed remedy will be determined on the basis of consultation with experts in women's education and higher education. Apparently, no such consultation has taken place yet, and no effort has been made to determine the feasibility of any specific remedy. Indeed, neither the South Carolina Commission on Higher Education nor the South Carolina General Assembly has been contacted by the defendants concerning the matter.

There is no suggestion by the defendants that the privatization of The Citadel is an available remedy. To the contrary, all indications are that the cost of such a remedy is prohibitive.

It also appears that the defendants have not given consideration to the admission of Faulkner to the Corps of Cadets as a possible remedy. In fact, they have made it clear that their primary objective in this litigation is to keep her out of the Corps.

19. The first step for the implementation of new educational programs in South Carolina's institutions of higher learning usually begins at the institutional level. Once an institution has determined to start a program it must send a letter of intent to the Commission's staff.

The next step is to take the proposal to the Commission on Higher Education for approval. The Commission has "program approval" and "termination approval." The Commission on Higher Education is charged with approving all lump sum appropriations for institutions in South Carolina and for making a recommendation to the General Assembly.

Within the Commission the program first goes through the staff of the Commission for comments, suggestions, or modifications. The submission then goes to an academic committee of the Commission. If the plan is approved by the academic committee it then goes to the full Commission on a quarterly basis for approval.

After the letter of intent reaches the Commission, it generally takes about one year to get approval depending on the complexity of the program sought and whether it has to go back to the committee or the institution for additional study. If the Commission determines that a program is a core program, it may approve such a program quickly, even with the lack of a large demand.

Once a new program is approved by the Commission on Higher Education, it goes to the South Carolina General Assembly, for funding. According to the Commissioner on Higher Education, there are no funds currently within the budget to begin any new programs in South Carolina, and they have not been available for a number of years.

Funding compact or contract arrangements with sister states is a much less arduous and expensive process than starting a new program. Because compact arrangements are less difficult to get approved, the state could expedite its decision to offer such a compact arrangement and get it through the legislature quickly. The difficulty with compact arrangements is dealing with the private institution. The state must get faculty and board approval which could take anywhere from one to two years.

20. A plan to start a new institution in South Carolina would undergo the most scrutiny by the Commission and would take the most time. Creating a new institution could take up to ten years because of the difficulty in getting a bond bill passed.

21. The *VMI* action was commenced on March 1, 1990, and Judge Kiser rendered his first opinion on June 14, 1991. The matter was then appealed to the Fourth Circuit Court of Appeals where it was argued on April 8, 1992, and a decision handed down by that court on October 5, 1992. The motion of the defendants for a rehearing was denied by the Fourth Circuit Court of Appeals on November 19, 1992, and certiorari was denied by the United States Supreme Court on May 24, 1993. From the day Judge Kiser filed his

opinion to the day judgment became final in the case twenty-one days less than two years was consumed. It is a foregone conclusion that this case will be pursued through every avenue of appeal available. If that process takes as much time as it did in *VMI*, a final judgment in this case will be rendered on June 29, 1996.[10] At that time Shannon Richey Faulkner will have just completed her junior year and will be waiting to begin her senior year. The South Carolina General Assembly will have adjourned *sine die* on June 6, 1996, to reconvene on the second Tuesday in January of 1997.

## CONCLUSIONS OF LAW

A. This court has jurisdiction of this case by virtue of 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(3). The United States of America properly intervened as a plaintiff pursuant to 42 U.S.C. § 2000h–2.

B. Plaintiffs claim that the admission policy of The Citadel that admits men and excludes women is unconstitutional. The United States Supreme Court has said that the constitutionality of such admission policies, usually called classifications in this context, must be determined under the cannons of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. *Reed v. Reed*, 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971).[11]

C. The Equal Protection Clause provides that "No State shall ... deny to any person within its jurisdiction the equal protection of the laws." [12] While that does not mean that everyone must be treated the same; it does mean that all persons similarly situated shall be treated alike. The Equal Protection Clause obviously does not limit its protection only to sex discrimination. Its reach is much broader than that. In addition, the scrutiny it gives to different types of discrimination is varied.

When one considers the circumstances existing in this country at the time the Fourteenth Amendment was adopted in 1868, it is not surprising that its main concern was the elimination of racial discrimination. That is still said to be its core purpose, and it subjects classifications based on race "to the most rigid scrutiny." *Korematsu v. U.S.*, 323 U.S. 214, 65 S.Ct. 193, 89 L.Ed. 194 (1944). "Race is the paradigm. A racial classification, regardless of purported motivation, is presumptively invalid and can be upheld only upon an extraordinary justification." *Personnel Administrator of Mass. v. Feeney*, 442 U.S. 256, 272, 99 S.Ct. 2282, 2292, 60 L.Ed.2d 870 (1979). *See also Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954); *McLaughlin v. Florida*, 379 U.S. 184, 85 S.Ct. 283, 13 L.Ed.2d 222 (1964). Conversely, classifications based on social or economic factors receive the lowest level of Fourteenth Amendment scrutiny. They are presumed valid and pass constitutional muster if they are rationally related to a legitimate state interest. *Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). A classification based on sex, the type involved in this case,[13] is subjected to greater Fourteenth Amendment scrutiny than that imposed on social or economic classifications but less than that directed at alleged racial discrimination.[14] It

10. If the Fourth Circuit Court of Appeals grants a motion for rehearing or *en banc* consideration or if the United States Supreme Court grants certiorari, it will take much longer for final judgment in this case to be reached.

11. *Reed v. Reed* states that the statute under consideration there "provides that different treatment be accorded to the applicants on the basis of their sex; it thus establishes a classification subject to scrutiny under the Equal Protection Clause." 404 U.S. at 75, 92 S.Ct. at 253.

12. The defendants are all clearly state actors and subject to jurisdiction under the Equal Protection Clause. *Missouri ex rel. Gaines v. Canada*, 305 U.S. 337, 59 S.Ct. 232, 83 L.Ed. 208 (1938).

13. It is important to note that the sexual classification involved in the instant case is *facially* discriminatory and the law evaluates such a classification somewhat differently from a *facially* neutral classification, such as a height and weight employment standard, that has a disproportionate impact upon men or women applicants. *See De La Cruz v. Tormey*, 582 F.2d 45 (9th Cir.1978).

14. We accept this as existing law even though Justice Ginsburg, in the case of *Harris v. Forklift*, —— U.S. ——, ——, 114 S.Ct. 367, 372, 126 L.Ed.2d 295 (1993), states that "it remains an open question whether classifications based upon gender are inherently suspect."

falls somewhere in between those two extremes and is thus called intermediate scrutiny. The United States Supreme Court in the case of *Mississippi University for Women v. Hogan,* 458 U.S. 718, 724, 102 S.Ct. 3331, 3336, 73 L.Ed.2d 1090 (1982), defined the rule applicable to this case as follows:

> Our decisions also establish that the party seeking to uphold a statute that classifies individuals on the basis of their gender must carry the burden of showing an "exceedingly persuasive justification" for the classification. *Kirchberg v. Feenstra,* 450 U.S. 455, 461 [101 S.Ct. 1195, 1199, 67 L.Ed.2d 428] (1981); *Personnel Administrator of Mass. v. Feeney,* 442 U.S. 256, 273 [99 S.Ct. 2282, 2293, 60 L.Ed.2d 870] (1979). The burden is met only by showing at least that the classification serves "important governmental objectives and that the discriminatory means employed" are "substantially related to the achievement of those objectives." *Wengler v. Druggists Mutual Ins. Co.,* 446 U.S. 142, 150 [100 S.Ct. 1540, 1545, 64 L.Ed.2d 107] (1980).

■ D. All classifications based on sex are not unconstitutional. The law recognizes that there are some real differences between men and women and permits different treatment that provides a legitimate accommodation for those differences. What the law will not allow, however, is classifications based on fixed notions, archaic and stereotypical notions, concerning the relative roles and abilities of females and males.

In most cases, therefore, our constitutional analysis of the policy in question would now turn to a careful consideration of the underlying reasons why The Citadel admits men and not women to its Corps of Cadets. Because of the considerable deference given to *VMI* herein, our course is not, however, the usual one. *VMI* has considerably reduced the scope of our inquiry, and we must now look to that case and its teachings and define the precise impact it has on our constitutional analysis in this case.

E. The three principal conclusions reached in *VMI* and adopted herein are as follows:

(1) single-gender education, and VMI's program in particular, is justified by a legitimate and relevant institutional mission which favors neither sex;

(2) the introduction of women at VMI will materially alter the very program in which women seek to partake; and

(3) the Commonwealth of Virginia, despite its announced policy of diversity, has failed to articulate an important policy that substantially supports offering the unique benefits of a VMI-type education to men and not to women.

*VMI,* 976 F.2d at 899. The court then remanded the case to the district court for the defendants "to formulate, adopt, and implement a plan that conforms with the Equal Protection Clause of the Fourteenth Amendment." *Id.* at 900. The court also gave the defendants some guidance as to what they might do to accomplish the purposes of the remand. In that regard, it had the following to say:

> [W]e remand the case to the district court to give to the Commonwealth the responsibility to select a course it chooses, so long as the guarantees of the Fourteenth Amendment are satisfied. Consistent therewith, the Commonwealth might properly decide to admit women to VMI and adjust the program to implement that choice, or it might establish parallel institutions or parallel programs, or it might abandon state support of VMI, leaving VMI the option to pursue its own policies as a private institution. While it is not ours to determine, there might be other more creative options or combinations.

*VMI,* 976 F.2d at 900.

■ By accepting the aforementioned law of *VMI* in this trial we have, in essence, invited the defendants to articulate an important policy that substantially supports offering the unique benefits of a Citadel-type education to men and not to women. If they can do so, they have satisfied the requirements of the Equal Protection Clause. If they cannot, they will be held, just as VMI and the Commonwealth of Virginia were, to have violated the Fourteenth Amendment by The Citadel's males only policy.

E. The State of South Carolina policy's that the defendants assert justifies the classification in question is expressed as follows:

[S]ingle-gender education in the higher educational system of South Carolina has been and continues to be offered to both men and women in accordance with the well-established and gender-neutral public policies of responding to reasonable demand, student choice, institutional autonomy, diversity, and economy of resources. At the present time, the demand for single-gender education for women in South Carolina is fully met by the private women's colleges, Converse and Columbia, whose South Carolina students receive state support through the Tuition Grants Program ... that South Carolina supports single-gender education for both women and men in response to the gender-neutral criterion of demand and that the absence of a public single-gender institution for women at the present time results from insufficient demonstrated demand.

Defendants' Post–Trial Proposed Findings of Fact and Conclusions of Law, p. 2. Based upon the past actions of the State of South Carolina and the expressions of its General Assembly in the Concurrent Resolution of 1993 this court concludes that it is now and has been for some time the policy of the State of South Carolina to provide educational opportunities to its citizens based on reasonable demand, student choice, institutional autonomy, diversity and economy of resources.

F. Simply put, the position of the defendants is that single-sex educational opportunities are not available to women in South Carolina's public system of higher education because there is insufficient demand for them. This justification is very appealing to those who sincerely revere The Citadel and its rich traditions, to those who determine where the scarce resources of this state will be placed, and to the many people, men and women, who live in this state and in undesignated places elsewhere who do not want to see The Citadel change. In a referendum the state's policy may be approved by a landslide, or it may fail. The problem is, this is not a referendum where the emotions and

likes and dislikes of the plurality carry the day. It also is not an occasion where one judge votes his will. In this matter the Constitution of the United States alone speaks and determines the outcome of this controversy.

G. The defendants have called the court's attention to no case that supports the proposition that lack of demand is a sufficient justification for the State of South Carolina providing single-sex education to men but not to women. A thorough search by this court has also failed to find any such precedent.

■ The Equal Protection Clause prohibits a state from denying "any person" within its jurisdiction equal protection of the laws. The rights it protects are personal and individual, and the courts have consistently so held for many years. *Missouri ex rel. Gaines v. Canada*, 305 U.S. 337, 59 S.Ct. 232, 83 L.Ed. 208 (1938); *Shelley v. Kraemer*, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948); *University of California Regents v. Bakke*, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978); *Carter v. School Board*, 182 F.2d 531 (4th Cir.1950). To suggest that a lack of demand for a certain type of equal protection can somehow justify the denial of another person's constitutional right thereto undermines the express intent of the Fourteenth Amendment.

Surprisingly, the defendants in their final brief cite the case of *Missouri ex rel. Gaines v. Canada*, 305 U.S. 337, 59 S.Ct. 232, 83 L.Ed. 208 (1938) in support of their position. That case arose almost twenty years before *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) and during the time when separate but equal facilities for the races and *Plessy v. Ferguson*, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896) were the law of the land. The State of Missouri had a law school for whites but did not have one for blacks. In order to provide equal facilities for blacks, therefore, the State of Missouri agreed to pay the tuition of any blacks desiring to go to law school at the law schools of the adjacent states of Kansas, Nebraska, Iowa, and Illinois, all of which permitted blacks to attend their law schools. The plaintiff applied for admission to the law school at the University of Missouri, but the

same was denied. He then instituted suit, claiming that the stated policy violated the Equal Protection Clause of the United States Constitution because it failed to provide him, a black, with facilities equal to those provided whites. The State of Missouri defended the action on the grounds that there was not sufficient demand by blacks for a separate law school which justified it providing one only for whites. The Supreme Court rejected that argument, and in doing so, referred to another leading case on the subject, *McCabe v. Atchison, T. & S.F. Ry. Co.*, 235 U.S. 151, 35 S.Ct. 69, 59 L.Ed. 169 (1914), in the following very pertinent quote:

> Nor can we regard the fact that there is but a limited demand in Missouri for the legal education of negroes as excusing the discrimination in favor of whites. We had occasion to consider a cognate question in the case of *McCabe v. Atchison, T. & S.F. Ry. Co. Supra.* There the argument was advanced, in relation to the provision by a carrier of sleeping cars, dining and chair cars, that the limited demand by negroes justified the State in permitting the furnishing of such accommodations exclusively for white persons. We found that argument to be without merit. It made, we said, the constitutional right "depend upon the number of persons who may be discriminated against, whereas the essence of the constitutional right is that it is a personal one. Whether or not particular facilities shall be provided may doubtless be conditioned upon there being a reasonable demand therefor, but, if facilities are provided, substantial equality of treatment of persons traveling under like conditions cannot be refused. It is the individual who is entitled to the equal protection of the laws, and if he is denied by a common carrier, acting in the matter under the authority of a state law, a facility or convenience in the course of his journey which under substantially the same circumstances is furnished to another traveler, he may properly complain that his constitu-

tional privilege has been invaded." *Id.*, [at] pp. 161, 162 [35 S.Ct. at p. 71].

Here petitioner's right was a personal one. It was as an individual that he was entitled to the equal protection of the laws, and the State was bound to furnish him within its borders facilities for legal education substantially equal to those which the State there afforded for persons of the white race, whether or not other negroes sought the same opportunity.[15]

*Missouri ex rel. Gaines*, 305 U.S. at 350, 59 S.Ct. at 237.

There is no indication that the United States Supreme Court has done anything to alter in any way whatsoever the legal principal stated in the above quote. To the contrary, it continues to clearly proclaim that those rights created by the Equal Protection Clause of the Fourteenth Amendment are personal, individual rights. *University of California Regents v. Bakke*, 438 U.S. 265, 289, 98 S.Ct. 2733, 2747, 57 L.Ed.2d 750 (1978). Accordingly, the policy of demand advanced by the defendants does not justify the State of South Carolina's policy of providing a Citadel-type education to men and not to women.

■ H. As has been noted above, the classification under scrutiny here is one that is *facially* discriminatory. Men are permitted to join the Corps of Cadets at The Citadel and women are not. Nothing could *facially* discriminate against women more. In arguing the sufficiency of their policy based on demand, however, the defendants abandon the well recognized constitutional analysis applicable to *facially* discriminatory classifications by sex and attempt to impose on the plaintiffs a more difficult burden of proof reserved for cases where the alleged sexual discrimination arises out of a classification that is not *facially* discriminatory. Pursuant to that argument, the defendants contend that "Faulkner and the United States can establish an equal protection violation only by showing that the South Carolina policy is a product of intentional, invidious discrimina-

---

**15.** It is not relevant to the present discussion, but since the defendants have suggested a compact arrangement with Mary Baldwin College in Virginia as a possible remedy in this case, it might be well at this time to note that *Missouri ex rel. Gaines v. Canada*, 305 U.S. 337, 59 S.Ct. 232, 83 L.Ed. 208 (1938) also stands for the proposition that such a compact would be unconstitutional.

tion." Defendants' Post–Trial Proposed Findings of Fact and Conclusions of Law, p. 24. In support of that proposition the defendants cite the case of *Personnel Administrator of Mass. v. Feeney,* 442 U.S. 256, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979). That case involved a Massachusetts statute that gave preferential treatment to veterans applying for state civil service positions. Since there are more male veterans than there are female, it was claimed that the statute discriminated against women and violated the Equal Protection Clause of the United States Constitution. That is clearly a classification that is not *facially* discriminatory and calls for a constitutional analysis far different from the one involved in the instant case. In addition, every case that the defendants cite to support their position that the plaintiffs must prove invidious discrimination in this case involved classifications that were not *facially* discriminatory. The defendants apparently attempt to justify such an approach by somehow claiming that it is not The Citadel's all-male admission policy that is under constitutional attack in this case. Instead, they seem to posit that the reasons behind the coeducation of Winthrop University and the state's failure to otherwise provide an institution of higher learning open only to women is the subject of constitutional scrutiny.[16] Such an argument is without merit. The classification that must withstand constitutional examination here is The Citadel's policy of admitting only males to its Corps of Cadets, and to prevail in this case it is not necessary for the plaintiffs to prove that said policy is the result of the State of South Carolina's intent to discriminate against women. *Reed v.*

*Reed,* 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971); *Frontiero v. Richardson,* 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973); *Craig v. Boren,* 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976); *Califano v. Goldfarb,* 430 U.S. 199, 97 S.Ct. 1021, 51 L.Ed.2d 270 (1977); and *Mississippi University for Women v. Hogan,* 458 U.S. 718, 102 S.Ct. 3331, 73 L.Ed.2d 1090 (1982).

I. The defendants have failed to articulate an important policy that substantially supports offering the unique benefits of a Citadel-type education to men and not to women, and The Citadel's refusal to admit Faulkner to its Corps of Cadets because of her sex violates her constitutional rights under the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution.

■ J. Having reached the foregoing conclusion that Faulkner's constitutional rights are being violated, the question of how to remedy that situation must be addressed. At the very beginning of this order it was noted that the primary difference in this case and the one instituted by the United States against Virginia Military Institute is that we have a real, live plaintiff here who wants to be admitted to the Corps of Cadets whereas in *VMI* the Department of Justice was the only plaintiff.[17] Because of that difference, the matter of remedy must be looked at from the standpoint of Faulkner and also from the standpoint of other women similarly situated who may seek to join the Corps of Cadets at some future date.

■ In *Brown v. Board of Education* 349 U.S. 294, 299, 75 S.Ct. 753, 755, 99 L.Ed.

---

**16.** The following is quoted from the Trial Transcript, Vol. XX, pp. 114, wherein counsel for The Citadel made the following statement in closing argument:

> But the Winthrop, the decision to allow Winthrop to become co-ed was not based upon gender as such. The legislation itself had no mention of gender. The annual appropriations that the state has given to its colleges made no mention of gender. The Commission on Higher Education policies for approving new programs and evaluating existing programs make no mention of gender.
>
> The policies and specific decisions which led to the state support of an institution for men and not a corresponding institution for women

is at least facially gender-neutral, because you can't find a decision or a statute out there that was made based upon gender alone.

**17.** When it had this case before it at the preliminary injunction stage, the Fourth Circuit Court of Appeals noted that difference by the following statement quoted from *Faulkner,* 10 F.3d at 233:

> Denying Faulkner's access, on the other hand, might likely become permanent for her, due to the extended time necessary to complete the litigation. The most telling aspect of this case, and that which distinguishes this case from *VMI,* is the presence of this time pressure, combined with an absence of present opportunity for Faulkner.

1083 (1955) (*Brown II*) the United States Supreme Court held that local school authorities have "the primary responsibility for elucidating, assessing and solving these problems; courts will have to consider whether the action of school authorities constitutes good faith implementation of the governing constitutional principles." [18] If the local authorities fail in their responsibility to remedy the constitutional deprivation "judicial authority may be invoked" for that purpose. *Swann v. Charlotte–Mecklenburg*, 402 U.S. 1, 15, 91 S.Ct. 1267, 1276, 28 L.Ed.2d 554 (1971). Once the power of the court is invoked "the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedy." *Id.*

It appears clear that the defendants thought that they would have the primary responsibility for devising a remedy if they were found to have violated Faulkner's constitutional rights. Indeed, the Concurrent Resolution of 1993 passed by the South Carolina General Assembly on May 20, 1993, had as its stated purpose the creation of a committee to "formulate recommendations for the General Assembly to consider in exploring alternatives for the provision of single-gender educational opportunities for women" and to report its recommendation to the General Assembly in January 1994. When it appeared to this court in February 1994, that this case was ready for trial, it assumed that, since the defendants had been considering the matter of remedy for almost a year, substantial strides had been made towards that goal. When the court set a trial date of May 18, 1994, therefore, it included within the issues to be tried that of remedy. At trial it became clear that nothing of substance had been done by the defendants towards fashioning a remedy. The committee met four times, made a report to the South Carolina General Assembly and was dissolved by operation of law. The South Carolina General Assembly adjourned its 1994 session without considering the matter of

single-sex education for women further. Consequently, there is nothing before the court at this time that permits it to determine what the defendants will do or can do to guarantee to the plaintiff her constitutional rights under the Equal Protection Clause. Not a single defendant signed the proposed remedial plan or testified in court as to their intentions or desires in regard thereto. All the court has is a document signed by the attorneys representing the defendants stating that within sixty days after liability is determined in this case the defendants will set forth a specific proposed remedy.

To place the matter of remedy in proper perspective, the manner in which the case has been conducted should also be taken into consideration. The Citadel has made no secret of the fact that its primary goal in this case is to keep Faulkner out of the Corps of Cadets, and the State of South Carolina appears ready to give its support to that cause. Not once has a defendant done anything to indicate that it is sincerely concerned to any extent whatsoever about Faulkner's constitutional rights. The most revealing fact of all, however, is that the defendants have continued to defend this case at a cost of millions of dollars to the taxpayers of South Carolina when they do not have a single case to offer in support of their position that a lack of demand for single-sex education on the part of women justifies its providing such an education only for men.

Time is not on the side of Faulkner. She is now a rising sophomore and cannot become a member of the Corps of Cadets after the beginning of her junior year. The Fourth Circuit in *VMI* enumerated three ways that women could be provided equal protection in that case but suggested that there might be more creative options or combinations. No such options or combinations have surfaced in this case, and there remain only three avenues through which Faulkner can receive the rights guaranteed to her under the Equal Protection Clause. Admit-

---

**18.** In remanding *VMI* as it did the Fourth Circuit Court of Appeals did not mention *Brown II* by name, but it obviously considered the rule of that case applicable. At least one judge sitting on the panel that heard the preliminary injunction appeal in this case also considers *Brown II* controlling on the issue of remedy in this case. The issue of remedy herein will, therefore, initially be viewed in the light of *Brown II*.

tedly, The Citadel cannot go private, and that leaves only two options remaining. One of those is a parallel institution or program, and the other is admission to the Corps of Cadets.

The defendants have almost total control over the development and implementation of a parallel institution or program. They alone can develop it, and they alone can fund it. In addition, it is clear that they can easily delay that process beyond the point in time that Faulkner would ever benefit from such a program. Throughout the pendency of this action the defendants have done nothing to indicate that they would be inclined to hasten that process. To the contrary, all of the actions witnessed by this court clearly and unequivocally indicate that the defendants would exert all of their considerable influence to insure that Faulkner would never have the opportunity to enroll in such a parallel institution or program.

Under the circumstances existing in this case, the court thus concludes that the only adequate remedy available to provide the plaintiff the rights guaranteed to her by the Equal Protection Clause is her immediate admission to the Corps of Cadets at The Citadel.[19]

K. This court has considered the issue of remedy for Faulkner within the context of *Brown II*. It has done so even though it has reservations about the applicability of that case and its progenies.

As *Brown II* dictates the United States Supreme Court has in many cases said that the court should first look to the state for a remedy to a constitutional deficiency before imposing its own. It has followed that rule in cases involving school desegregation, reapportionment, defects in election processes, prison overcrowding, and others. It has also recognized that there are some violations of the Fourteenth Amendment that do not require such a procedure. *Watson v. City of Memphis,* 373 U.S. 526, 83 S.Ct. 1314, 10 L.Ed.2d 529 (1963), is a case that falls into

such a category and expresses a rule of remedy that seems to more clearly fit the facts and needs of this case than does that of *Brown II*.

*Watson* is a case where the plaintiffs sought immediate injunctive relief desegregating the municipal parks and recreational facilities of the City of Memphis, Tennessee. The defendants asked for additional time to desegregate. In addressing the applicability of *Brown II* the court had the following to say:

> This case presents no obvious occasion for the application of Brown. We are not here confronted with attempted desegregation of a local school system with any or all of the perhaps uniquely attendant problems, administrative and other, specified in the second Brown decision as proper considerations in weighing the need for further delay in vindicating the Fourteenth Amendment rights of petitioners. Desegregation of parks and other recreational facilities does not present the same kinds of cognizable difficulties inhering in elimination of racial classification in schools, at which attendance is compulsory, the adequacy of teachers and facilities crucial, and questions of geographic assignment often of major significance. Most importantly, of course, it must be recognized that even the delay countenanced by Brown was a necessary, albeit significant, adaptation of the usual principle that any deprivation of constitutional rights calls for prompt rectification. The rights here asserted are, like all such rights, present rights; they are not merely hopes to some future enjoyment of some formalistic constitutional promise. The basic guarantees of our Constitution are warrants for the here and now and, unless there is an overwhelmingly compelling reason, they are to be promptly fulfilled.

*Watson,* 373 U.S. at 531, 83 S.Ct. at 1318. There are other cases with facts more similar to those involved here that stand for the

---

**19.** At the conclusion of the trial of this case on May 27, 1994, the court asked the parties to submit a plan for admitting Faulkner to the Corps of Cadets if it imposed that as a remedy. Plaintiffs and defendants have responded, and

the court shall forthwith conduct an evidentiary hearing to consider those plans and other pertinent matters with a view towards promptly issuing another order detailing the particulars of Faulkner's admission to the Corps.

same proposition. *State of Florida v. Board of Control,* 351 U.S. 915, 76 S.Ct. 693, 100 L.Ed. 1449 (1956); *Meredith v. Fair,* 305 F.2d 343 (5th Cir.1962).

The *Meredith* case is an interesting one to read. It brings back memories of another world and a way of life that many of us find difficult to believe ever existed. It is also evidence of the fact that many of the sentiments and tactics prevalent in that time have, to some extent, again surfaced in this case. The *Meredith* case, however, is not cited for those reasons. It is referred to because it stands for the proposition that *Brown II* and its requirement that discrimination be removed with "all deliberate speed" is inapplicable to a situation such as the one at hand. It speaks directly to the situation Faulkner is now in:

> As a matter of law, the principle of 'deliberate speed' has no application at the college level; time is of the essence. In an action for admission to a graduate or undergraduate school, counsel for all the litigants and trial judges too should be sensitive to the necessity for speedy justice.

*Meredith,* 305 F.2d at 352. This court concludes that this is the proper rule to apply in fashioning a remedy for Faulkner. It, of course, also requires her admission to the Corps of Cadets.

L. The question of a remedy for Faulkner is critical. Such is not the case for other qualified women who may wish to attend The Citadel. No other women have asked to be admitted to the Corps of Cadets, and with the new school year only a few weeks away, The Citadel could not be expected to now process any applications for admission this year. The proposed remedial plan of the defendants should be given an opportunity to proceed. It may be able to provide an adequate remedy for any constitutional grievances future female applicants to The Citadel may have. But a plan that conforms with the Equal Protection Clause of the Fourteenth Amendment must be formulated, adopted and implemented for the 1995–1996 school year. Otherwise, the court will have no alternative but to require the defendant to admit qualified women who apply in the future to the Corps of Cadets.

*ORDER*

IT IS, THEREFORE, ORDERED that the defendant forthwith admit Shannon Richey Faulkner to the South Carolina Corps of Cadets under such terms and conditions as this court hereafter orders.

IT IS FURTHER ORDERED that the defendants pursue their proposed remedial plan without delay and formulate, adopt, and implement a plan that conforms with the Equal Protection Clause of the Fourteenth Amendment of the Constitution of the United States of America by the beginning of the school year 1995–1996.