51 F.3d 440
 63 USLW 2665, 99 Ed. Law Rep. 99
 Shannon Richey FAULKNER; United States of America,
Plaintiffs-Appellees,
v.
James E. JONES, Jr., Chairman, Board of Visitors of The
Citadel, the Military College of South Carolina; Carrol A.
Campbell, Jr., Member of the Board of Visitors of The
Citadel, the Military College of South Carolina; T. Easton
Marchant, Member of the Board of Visitors of The Citadel,
the Military College of South Carolina; Barbara S. Nielsen,
Member of the Board of Visitors of The Citadel, the Military
College of South Carolina; William F. Prioleau, Jr., Member
of the Board of Visitors of The Citadel, the Military
College of South Carolina; William E. Jenkinson, III,
Member of the Board of Visitors of The Citadel, the Military
College of South Carolina; Leonard C. Fulghum, Jr., Member
of the Board of Visitors of The Citadel, the Military
College of South Carolina; James M. Leland, Jr., Member of
the Board of Visitors of The Citadel, the Military College
of South Carolina; John A. McAllister, Jr., Member of the
Board of Visitors of The Citadel, the Military College of
South Carolina; David S. Boyd, Jr., Member of the Board of
Visitors of The Citadel, the Military College of South
Carolina; Julian G. Frasier, III, Member of the Board of
Visitors of The Citadel, the Military College of South
Carolina; James W. Bradin, Member of the Board of Visitors
of The Citadel, the Military College of South Carolina;
Larry J. Ferguson, Member of the Board of Visitors of The
Citadel, the Military College of South Carolina; Steve D.
Peper, Member of the Board of Visitors of The Citadel, the
Military College of South Carolina; Wallace I. West, Jr.,
Director of Admissions and Recruiting at The Citadel, the
Military College of South Carolina; Claudius E. Watts, III,
President of The Citadel, the Military College of South
Carolina, in their official capacities; State of South
Carolina; the Citadel, the Military College of South
Carolina; the Board of Visitors of the Citadel, the
Military College of South Carolina, Defendants-Appellants.
National Women's Law Center; American Association of
University Women; California Women's Law Center; Center
for Advancement of Public Policy; Center for Women Policy
Studies; Clearinghouse on Women's Issues; Coalition of
Labor Union Women; Connecticut Women's Education and Legal
Fund; Equal Rights Advocates; Federally Employed Women,
Incorporated; Feminist Majority Foundation; Human Rights
Campaign Fund; Lawyer's Committee for Civil Rights Under
Law; National Association of Girls & Women in Sports;
National Association of Commissions for Women; National
Council of Jewish Women; National Council of Negro
Women, Incorporated; National Education Association;
National Hook-up of Black Women, Incorporated; National
Organization for Women; NOW Legal Defense and Education
Fund; National Women's Party; National Women's Conference
Committee; National Women's Political Caucus; Northwest
Women's Law Center; Trial Lawyers for Public Justice;
Wider Opportunities for Women; Women Employed; Women's Law
Project; Women's Legal Defense Fund; Carol Gilligan,
Ph.D.; Valerie E. Lee, Ed.D.; Diane S. Pollard, Ph.D.;
Bernice Sandler, Ed.D.; Program on Gender, Science and Law
at Columbia University School of Public Health, Amici Curiae.
 No. 94-1978.
 United States Court of Appeals,
Fourth Circuit.
 Argued Jan. 30, 1995.
Decided April 13, 1995.
 
 ARGUED: Morris Dawes Cooke, Jr., Barnwell, Whaley, Patterson & Helms, Charleston, Robert Holmes Hood, Hood Law Firm, Charleston, SC, for appellants. Valorie Kay Vojdik, New York University School of Law, New York City, for appellee Faulkner; Thomas Evans Chandler, U.S. Dept. of Justice, Washington, DC, for appellee U.S. ON BRIEF: William R. Hearn, Jr., Joseph C. Wilson, IV, Hood Law Firm, Charleston, SC, Griffin B. Bell, William A. Clineburg, Jr., Dwight J. Davis, King & Spalding, Atlanta, GA, Robert H. Patterson, Jr., Anne Marie Whittemore, William G. Broaddus, J. William Boland, McGuire, Woods, Battle & Boothe, Richmond, VA, for appellants. Sara L. Mandelbaum, American Civil Liberties Union Foundation Women's Rights Project, Henry Weisburg, Thomas F. Swift, Mary K. Warren, Vanessa Beever, Shearman & Sterling, New York City, Robert R. Black, Charleston, SC, Suzanne E. Coe, Silver & Coe, Greenville, SC, for appellee Faulkner; Deval L. Patrick, Asst. Atty. Gen., David K. Flynn, U.S. Dept. of Justice, Washington, DC, for appellee U.S. Marcia Greenberger, Deborah L. Brake, National Women's Law Center, Walter J. Rockler, Peter G. Neiman, Arnold & Porter, Washington, DC, for amici curiae Nat. Women's Law Center, et al. Joan E. Bertin, Program on Gender, Science and Law, Columbia University School of Public Health, New York City, for amici curiae Gilligan, et al.
 Before HALL, NIEMEYER, and HAMILTON, Circuit Judges.
 Affirmed as modified and remanded by published opinion. Judge NIEMEYER wrote the opinion in which Judge HALL concurred. Judge HALL wrote a separate concurring opinion; Judge HAMILTON wrote a dissenting opinion.
 NIEMEYER, Circuit Judge:
 
 
 1
 We are presented with the questions of (1) whether South Carolina and The Citadel, in refusing Shannon R. Faulkner admission to The Citadel, denied her equal protection of the laws in violation of the Fourteenth Amendment and (2) whether the remedy ordered by the district court is an appropriate one. In a bifurcated remedial order, the district court directed first that Faulkner be admitted to The Citadel's Corps of Cadets "forthwith" and second that South Carolina and The Citadel proceed "without delay" to formulate, adopt, and implement a plan for women other than Faulkner by the beginning of the 1995-96 school year which conforms with the Equal Protection Clause.
 
 
 2
 We affirm the district court's ruling that South Carolina and The Citadel are denying Faulkner equal protection of the laws in violation of the Fourteenth Amendment. As for the remedy, we affirm with modification, remanding the case to the district court (1) to establish a new, practicable but prompt timetable in requiring defendants to formulate, adopt, and implement a remedial plan that conforms with the Equal Protection Clause, and (2) to require The Citadel to admit Faulkner to the Corps of Cadets by the date in August 1995 when the Cadets are required to report, if such plan is not approved by the court and implemented before that date.
 
 
 3
 * When Shannon Faulkner, a female high school senior, was refused admission to The Citadel, South Carolina's state-supported military college, pursuant to its male-only admission policy, she filed suit under 42 U.S.C. Sec. 1983, alleging that South Carolina and The Citadel denied her equal protection of the laws in violation of the Fourteenth Amendment. Pending the litigation, the district court, by preliminary injunction, required The Citadel to allow Faulkner to attend day classes, but did not order The Citadel to admit her to the Corps of Cadets, and we affirmed that preliminary injunction. Faulkner v. Jones, 10 F.3d 226 (4th Cir.1993). Following a two-week bench trial on the merits, the district court found that the defendants were in violation of the Equal Protection Clause and ordered, on July 22, 1994, that The Citadel "forthwith admit Shannon Richey Faulkner to the South Carolina Corps of Cadets under such terms and conditions as this court hereafter orders." Faulkner v. Jones, 858 F.Supp. 552, 569 (D.S.C.1994). The court also directed that for women other than Faulkner the defendants "without delay ... formulate, adopt, and implement a plan that conforms with the Equal Protection Clause." Id. Pursuant to a subsequent hearing to determine the conditions under which Faulkner would be admitted to the Corps of Cadets, the court entered an order on August 5, 1994, accepting those conditions on which the parties agreed and resolving their remaining disagreements.[1]
 
 
 4
 This appeal followed.
 
 II
 
 5
 In United States v. Commonwealth of Virginia (VMI I), 976 F.2d 890 (4th Cir.1992), cert. denied, --- U.S. ----, 113 S.Ct. 2431, 124 L.Ed.2d 651 (1993), we held that Virginia's maintenance of a male-only admissions policy at Virginia Military Institute (VMI) without the provision of a comparable opportunity for women was not justified by a state policy of providing diversity in education, and we therefore concluded that Virginia was violating the Equal Protection Clause. We remanded the case to the district court to give Virginia the responsibility of selecting a remedial course, and we noted that, among available permissible courses of action, Virginia could (1) change its policy at VMI and admit women, adjusting the program to implement that choice; (2) establish parallel institutions or programs for men and women; or (3) abandon state support of VMI, allowing that institution to pursue its own policies as a private institution. On remand, Virginia elected to provide single-gender education to both genders by continuing to provide male-only education at VMI and by establishing a women's institute with distinctive leadership training at Mary Baldwin College. The district court approved the plan and, in United States v. Commonwealth of Virginia (VMI II), 44 F.3d 1229 (4th Cir.1995), we affirmed.
 
 
 6
 In VMI II, applying a special intermediate scrutiny test designed to analyze a state's provision of single-gender education, we held that Virginia's plan of providing single-gender education is not a pernicious state objective. On the contrary, because the state presented sufficient data to support the proposition that a sexually-neutral environment yields concrete educational benefits, we concluded that Virginia could opt for single-gender education as a legitimate and important part of its overall objective of providing higher education to its citizens. We noted, however, that when providing single-gender education to one gender, Virginia could not, without adequate justification, deny a substantively comparable benefit to the other gender. For purposes of determining whether a parallel educational offering is substantively comparable, we held that programs aimed at achieving similar results should not be rejected simply because they differ in approach. We therefore concluded that single-gender offerings to men and women need not be identical in form and detail, but rather that differences in the programs could reflect established differences in the educational needs of the two genders so long as the value of the benefits provided to one gender did not, by comparison to the benefits provided to the other, tend to lessen the dignity, respect, or societal regard of the other gender.
 
 
 7
 The principles stated in VMI I and VMI II apply to this case.
 
 III
 
 8
 South Carolina challenges the district court's ruling that South Carolina and The Citadel are denying Faulkner equal protection of the laws by refusing her admission to The Citadel and its Corps of Cadets. Without challenging any factual findings by the district court, the state argues that its overall higher education policy is administered neutrally and that there is no evidence of an invidious intent to discriminate on the basis of gender behind the admissions policies of its colleges and universities. South Carolina asserts that its present configuration of higher educational programs is the product of historical, gender-neutral factors, including student demand and institutional autonomy. It argues that if we consider all aspects of its system of higher education, including its offering of tuition grants to qualified women who attend private single-gender institutions, we would find that "the overall educational benefits and opportunities of South Carolina's system of higher education flow evenly to men and women." In the absence of evidence of intentional or invidious discrimination, the state argues, the district court erred in refusing to apply the holding of Personnel Adm'r v. Feeney, 442 U.S. 256, 279, 99 S.Ct. 2282, 2296, 60 L.Ed.2d 870 (1979) (female plaintiff challenging a gender-neutral statute on equal protection grounds must show that the "state legislature selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon [women]").
 
 
 9
 What South Carolina fails to appreciate, however, is that even if its current offering of single-gender education solely to males is the product of historical factors which were not themselves invidiously discriminatory against women, the male-only admissions policy of The Citadel is nevertheless an explicit gender-based classification. Although facially neutral statutes which have a discriminatory impact do not violate the Equal Protection Clause unless discriminatory intent can be demonstrated, see Sylvia Development Corp. v. Calvert County, Md., 48 F.3d 810, 818-19 (1995), discriminatory intent need not be established independently when the classification is explicit, as in this case. See Feeney, 442 U.S. at 272-73, 99 S.Ct. at 2292-93; see also Mississippi Univ. for Women v. Hogan, 458 U.S. 718, 102 S.Ct. 3331, 73 L.Ed.2d 1090 (1982).
 
 
 10
 Even though invidious discriminatory intent behind a state policy need not be shown when the policy explicitly utilizes a gender classification, we must nevertheless determine, in conducting an equal protection analysis, whether South Carolina's means for achieving its objective of single-gender education withstand intermediate scrutiny. See VMI II, 44 F.3d at 1237. See also Hogan, 458 U.S. at 724-25, 102 S.Ct. at 3336-37.
 
 
 11
 In ruling that South Carolina and The Citadel are denying Faulkner equal protection of the laws in this case, the district court applied our holding in VMI I to conclude that the provision of single-gender education is a legitimate and important state objective, but that the state must "articulate an important policy" that justifies offering single-gender education to men and not to women. 858 F.Supp. at 563. Comparing the circumstances of this case with those in VMI I, the court noted that the only difference is that in this case "we have a real, live plaintiff who, but for her sex, would probably be a member of the Corps of Cadets," whereas in VMI I, the United States government was the only plaintiff. 858 F.Supp. at 554 n. 2. Because the parties agreed that the benefits of single-gender education need not be retried, they only litigated the issue of whether South Carolina could sufficiently justify offering single-gender education to males and not to females.
 
 
 12
 On the issue of justification, the district court summarized South Carolina's trial position as follows:
 
 
 13
 Simply put, the position of the defendants is that single-sex educational opportunities are not available to women in South Carolina's public system of higher education because there is insufficient demand for them.
 
 
 14
 858 F.Supp. at 564. On the issue of demand, the court stated that South Carolina failed to present evidence from which the court could conclude that there was an absence of demand among women for public single-gender education.[2] Nevertheless, it concluded as a matter of law that an absence of demand among women could not justify the provision of public single-gender education to men and not to women. The district court stated, "To suggest that a lack of demand for a certain type of equal protection can somehow justify the denial of another person's constitutional right thereto undermines the express intent of the Fourteenth Amendment." 858 F.Supp. at 564. The court accordingly concluded that South Carolina and The Citadel are denying Faulkner her rights under the Equal Protection Clause.
 
 
 15
 Even though the district court found no evidence to support a finding of inadequate demand, it relied for its ultimate finding of liability on its conclusion of law that demand is not relevant to an equal protection analysis because a person's right not to be subject to discrimination is a personal, individual right. The court held that an absence of demand among other members of plaintiff's gender cannot justify a deprivation of that right with respect to an individual plaintiff. While that principle may indeed hold true for civil rights guaranteed by the Constitution, cf. J.E.B. v. Alabama ex rel. T.B., --- U.S. ----, ---- - ----, 114 S.Ct. 1419, 1433-34, 128 L.Ed.2d 89 (1994) (Kennedy, J., concurring), the answer is not so clear when we consider whether and to whom the state may confer an economic benefit, at least in the context of single-gender education. For example, if a state chooses to offer single-gender education to each gender and if no person of one gender applies, is the state therefore precluded from offering single-gender education to the other gender? The question becomes yet more complex when we consider a single-gender educational program which requires a substantial outlay of capital. May the state require as a condition of providing the program that a minimum number of each gender, necessary to render the program viable, apply? And what are the constitutional rights, if any, of the few who do apply to such a program when their numbers are insufficient to form a student base?
 
 
 16
 In this case, however, we need not resolve the difficult legal issue of whether an absence of demand among members of one gender may justify a state's failure to offer single-gender education to that gender, because we concur in the district court's finding that the defendants failed to present evidence supporting an absence of demand. While South Carolina contends that the "current absence of a Citadel for women results ... from an absence of adequate demand by young women to support such an institution or program" (emphasis added), it has not offered evidence sufficient to establish that absence of demand. It points to 20-year old evidence of declining student population at the all-women's state-supported Winthrop College when that school became coeducational. Yet the state also acknowledges that, even at its lowest point, demand was substantial enough at Winthrop to sustain a female student population of 2,500, a number that exceeds the present male population in The Citadel's Corps of Cadets. Moreover, the state agrees that virtually no evidence was presented on the issue of demand from the time Winthrop became coeducational to the present date. South Carolina's evidence of current demand among women for single-gender education consists solely of the testimony of Robert C. Gallagher, Chairman of the South Carolina Commission on Higher Education, which is the body charged with evaluating the goals of state educational institutions and with approving new educational programs. South Carolina states that "[a]ccording to Mr. Gallagher, in the 20 years since Winthrop became coeducational, not one request for a single-gender program for women, military or otherwise, has been submitted to the Commission." But the state fails to explain how this evidence is probative of the current interest of South Carolina women in pursuing single-gender education. As the attorney representing South Carolina was required to concede at oral argument, there really is no data before this court to support a finding of an absence of demand among women at the present time for single-gender education of any type.
 
 
 17
 Thus, even though it is South Carolina's currently announced policy to provide single-gender education to both men and women and to allow gender-neutral factors, including demand and institutional autonomy, to determine whether public single-gender education will in fact be provided to each gender, this policy cannot justify the state's failure to offer single-gender education to women when an absence of demand among women for such education has not been demonstrated. We agree with the district court that South Carolina has not carried its burden of justifying its failure to afford women single-gender education. The district court's ruling that South Carolina and The Citadel are in violation of the Equal Protection Clause is therefore affirmed.
 
 IV
 
 18
 South Carolina also argues that the remedy selected by the district court in this case is inappropriate. While South Carolina does not challenge the portion of the district court's order that allows the state to elect a course of action with respect to women other than Faulkner, it does object to the portion that directs The Citadel to admit Faulkner into the Corps of Cadets forthwith. Relying on general principles of comity and federalism, South Carolina asserts that it should have been given an opportunity to correct its constitutional violation before the district court imposed a remedy, citing our decision in VMI I (remanding case to permit Virginia to select a remedial course consistent with the Fourteenth Amendment). Recognizing that a state's unreasonable delay in complying with a longstanding remedial duty justifies the court's selection and imposition of a remedy, see Swann v. Charlotte-Mecklenburg Bd. of Educ., 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1970), South Carolina seeks to distinguish the facts in this case to argue that it has not defaulted on its remedial obligation. It states that "far from seeking delay, South Carolina sought to expedite resolution of both the liability and remedy portions of this case."
 
 
 19
 The district court, however, found facts that contradict South Carolina's self-assessment. It concluded:
 
 
 20
 At trial it became clear that nothing of substance had been done by the defendants towards fashioning a remedy.
 
 
 21
 * * * * * *
 
 
 22
 Not once has a defendant done anything to indicate that it is sincerely concerned to any extent whatsoever about Faulkner's constitutional rights.
 
 
 23
 * * * * * *
 
 
 24
 Time is not on the side of Faulkner. She is now [in July 1994] a rising sophomore and cannot become a member of the Corps of Cadets after the beginning of her junior year.... Admittedly, The Citadel cannot go private, and that leaves only two options remaining. One of those is a parallel institution or program, and the other is admission to the Corps of Cadets.
 
 
 25
 * * * * * *
 
 
 26
 [I]t is clear that [defendants] can easily delay [the process of developing and implementing a parallel institution or program] beyond the point in time that Faulkner would ever benefit from such a program. Throughout the pendency of this action the defendants have done nothing to indicate that they would be inclined to hasten that process. To the contrary, all of the actions witnessed by this court clearly and unequivocally indicate that the defendants would exert all of their considerable influence to insure that Faulkner would never have the opportunity to enroll in such a parallel institution or program.
 
 
 27
 858 F.Supp. at 567-68. The court found accordingly that "the only adequate remedy available ... is [Faulkner's] immediate admission to the Corps of Cadets at The Citadel." Id. at 568.
 
 
 28
 Although South Carolina does not challenge the court's factual findings, some background is helpful in determining whether South Carolina's inaction should be taken into account in fashioning an appropriate remedy.
 
 
 29
 In VMI I, which was decided in October 1992, we concluded that the state-supported all-male military program at VMI, similar to that at The Citadel, violated the Equal Protection Clause and that Virginia was required to select the means of remedying this violation on remand.[3] We noted that Virginia could
 
 
 30
 properly decide to admit women to VMI and adjust the program to implement that choice, or it might establish parallel institutions or parallel programs, or it might abandon state support of VMI, leaving VMI the option to pursue its own policies as a private institution. While it is not ours to determine, there might be other more creative options or combinations.
 
 
 31
 976 F.2d at 900. The VMI decision, which fairly must be construed to apply also to The Citadel, placed South Carolina on notice that it needed to pursue a remedy to address its similar situation. There can be little question that South Carolina was fully aware of the implications of VMI I, since many of the same lawyers who represented VMI also represent The Citadel in this case.
 
 
 32
 Several months later, in May 1993, the South Carolina General Assembly responded directly to the VMI I decision (and to Faulkner's March 1993 complaint), adopting Concurrent Resolution H.4170 in which South Carolina affirmed a "policy of diversity" and a "policy of choice," policies which included offering citizens of South Carolina single-gender higher education. The legislature recognized the state's responsibility for providing single-gender education for women and acknowledged that the current array of state-supported educational institutions did not include such an option. Because "the members of the General Assembly ... [believed] that it is appropriate for this State to begin the process of providing single-gender educational opportunities for women," the legislature established a 10-member committee "to assist the State of South Carolina in carrying out its responsibilities." The committee was directed to "formulate recommendations for the General Assembly to consider in exploring alternatives for the provision of single-gender educational opportunities for women," and to submit a report to the General Assembly at the beginning of its next legislative session in January 1994. The committee met four times, prepared a report, and timely submitted it to the legislature, outlining several alternatives for consideration. By operation of the law, the committee was then dissolved. The legislature, however, gave no consideration to the matter during its 1994 session and took no action on the recommendations. In an affidavit submitted later by the Speaker of the South Carolina House of Representatives, the Speaker explained:
 
 
 33
 At this time we have little guidance as to what type of plan, if any, may be constitutionally required or allowed. We are anticipating a ruling soon from the district court in the VMI litigation which may be instructive in this regard.
 
 
 34
 The Speaker thus apparently believed that it was necessary to know whether Virginia 's parallel program at Mary Baldwin College would be court approved before South Carolina would decide whether and how to fulfill its remedial obligation.
 
 
 35
 In the meantime, in November 1993, we handed down an interim decision in this case in which we stated:On the state of the record as it now exists, we can perceive no reason why our holding in [VMI I ] would not apply in this case. The Citadel is a state-supported military college not unlike the Virginia Military Institute, which was the subject of our holding in [VMI I ].
 
 
 36
 Faulkner v. Jones, 10 F.3d at 232.
 
 
 37
 By the time of trial in May 1994, South Carolina still had made no decision on the course it would pursue. In pretrial proceedings before the district court, South Carolina filed a motion to bifurcate the trial and have the court consider the issue of liability first, before trying the issue of remedy. The court denied the motion and ordered defendants to submit a remedial plan prior to trial. Despite the order, South Carolina declined to indicate its choice of remedy either before or during trial. Rather, it requested that it be given 60 days from any liability determination to designate a specific remedy for further development.
 
 
 38
 Following trial the district court made a factual finding that South Carolina had taken no steps to determine the feasibility of any specific remedy. 858 F.Supp. at 567. It found that the privatization of The Citadel was unavailable as prohibitively expensive and that the defendants had not given any consideration to coeducation at The Citadel. Id. at 561. Accordingly, the court concluded that if the state still wished to maintain The Citadel as an all-male institution, the only available remedy was the establishment of a parallel institution for women. Id. at 568. But the court also found that creating a new women's institution in South Carolina could take up to ten years. Id. at 561. It was thus that the court concluded,
 
 
 39
 [T]here is nothing before the court at this time that permits it to determine what the defendants will do or can do to guarantee to the plaintiff her constitutional rights under the Equal Protection Clause.
 
 
 40
 Id. at 567. Because Faulkner could not become a member of the Corps of Cadets after the beginning of her junior year (in August 1995), the district court ordered that she be admitted to the Corps of Cadets forthwith as the only available remedy. Id. at 569.
 
 
 41
 * It is difficult to understand why in 1992, or even in the year or two that followed, South Carolina did not consider VMI I to apply to it and, as Virginia did, begin the process of selecting a course to correct the problem. Even though unwillingness to face a difficult decision involving the continuation of a historically revered institution is not an adequate justification for delay, we nevertheless believe that it remains in the interest of comity that the state, and not a federal court, select its future course for educating its citizens. As we noted in VMI I, the state should have the opportunity to reassess its higher education policies and determine the nature of the benefits that it wishes to offer its citizens. If it elects to maintain single-gender education at The Citadel, then it must provide parallel programs for men and women that are substantively comparable. See VMI II. Alternatively, the state may adopt a coeducational policy for The Citadel, or it may withdraw state support from The Citadel and permit that institution to continue as a private institution. In any event, for the purpose of determining the course South Carolina will take hereafter, we remand the case to the district court to establish a timely but practicable schedule under which the state must formulate, adopt, and implement a plan that conforms with the Equal Protection Clause of the Fourteenth Amendment and to oversee implementation of the state's plan.
 
 
 42
 The district court included this course of action as part of its remedial order, but it directed that the remedial plan be accomplished by the beginning of the 1995-96 academic year. In view of the lapse of time caused by the prosecution of this appeal and the complexity of the issues, we conclude that the time frame mandated by the district court is now impracticable. Therefore on remand, the district court should establish a new schedule, taking into account the steps reasonably necessary to formulate, adopt, and implement a remedial plan and allowing reasonable, but not dilatory, amounts of time for each step.
 
 B
 
 43
 As the district court pointed out, however, the key aspect of this case that differs from VMI I is the presence here of an individual plaintiff whose equal protection rights have been violated. While institutional changes potentially involving substantial outlays of capital can take time, Faulkner's rights are directly affected right now. If she is not admitted to the Corps of Cadets by the beginning of her junior year in August 1995, that option becomes foreclosed to her because of The Citadel's graduation requirements. See 858 F.Supp. at 557 & n. 6. Foreclosure of that option in these circumstances might therefore deny Faulkner any meaningful remedy, whether through The Citadel or a parallel program for women. Moreover, the pressing nature of the time constraints on Faulkner's personal educational circumstances has been exacerbated by the lack of any state decision, as discussed above.
 
 
 44
 Analogous, but not totally similar, to Faulkner's circumstances were the remedial issues presented to the Supreme Court in Sipuel v. Board of Regents of the Univ. of Okla., 332 U.S. 631, 68 S.Ct. 299, 92 L.Ed. 247 (1948), and Missouri ex rel. Gaines v. Canada, 305 U.S. 337, 59 S.Ct. 232, 83 L.Ed. 208 (1938). In those cases, during the era prior to Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), when the Supreme Court constitutionally sanctioned separate educational institutions for whites and blacks, qualified black students were denied admission to the state law schools of Oklahoma and Missouri while those states failed to provide comparable law schools for blacks. It was observed in those cases that Oklahoma and Missouri could have preempted judicial findings of liability under the Equal Protection Clause by pursuing one of at least three different options: (1) admitting black students to the state law school; (2) undertaking the creation of a separate law school for blacks; or (3) forgoing state support for the state law school. See, e.g., Gaines, 305 U.S. at 343-46, 59 S.Ct. at 233-35. At the time those cases were tried, however, the defendant states had made little or no progress toward establishing separate law schools for blacks, and the existing public law schools had not opted to forgo state funding.
 
 
 45
 Although neither Missouri nor Oklahoma had seriously pursued any efforts to preempt a judicial finding of liability, those states argued, as does South Carolina here, that it would be improper for the court to order plaintiffs admitted to the state law schools. In Sipuel, it was argued that the state had an insufficient opportunity to develop a separate law school for the plaintiff and that a court order admitting the plaintiff to the existing state law school would improperly foreclose the defendant's prerogative to choose which remedial option to pursue, in violation of the principles of federalism and comity. See Sipuel v. Board of Regents of Univ. of Okla., 199 Okla. 36, 180 P.2d 135, 142 (1947), rev'd, 332 U.S. 631, 68 S.Ct. 299, 92 L.Ed. 247 (1948). The Supreme Court of Oklahoma was persuaded by this argument and refused to order the plaintiff admitted to the state law school, holding that to do so would wrongfully deny the defendant state "the right or option or opportunity to provide separate education in law for [plaintiff]." Id.
 
 
 46
 In Gaines, it was argued that since the discrimination against the plaintiff would be only temporary--while a law school for blacks was being developed--the resultant temporary discrimination did not rise to the level of an equal protection violation. See 305 U.S. at 351-52, 59 S.Ct. at 237-38.
 
 
 47
 The Supreme Court rejected the states' arguments in both cases, holding that the only constitutional remedy for the equal protection violations in the circumstances presented was for the court to order the immediate admission of each plaintiff to the respective state law school. See Gaines, 305 U.S. at 352, 59 S.Ct. at 237-38; Sipuel, 332 U.S. at 633, 68 S.Ct. at 299-300. Thus, although the defendants in those cases may have initially had three options to avoid liability under the Equal Protection Clause--admit plaintiff to the state law school for white students, create separate schools for plaintiffs, or withdraw state funding from the law school--defendants were found effectively to have forfeited the prerogative of selecting which option to pursue when, at the time of trial, they had failed to proffer from among such options a constitutionally sufficient remedy. Accordingly, the Court concluded that a judicially imposed remedy was necessary.
 
 
 48
 While the context of the Sipuel and Gaines decisions is not completely analogous--since the "separate but equal" standard is inapposite to the context of state-supported single-gender education, see VMI II, 44 F.3d at 1237 n.*--the basic remedial principle still applies that a state may not continue to ignore a clear judicial mandate finding a constitutional violation and still retain the opportunity to select its course of remedy. This principle applies with even greater force in a case such as this, which was filed over two years ago by an individual plaintiff who is presently in the midst of her college career and for whom time is of the essence. Thus, South Carolina may have forfeited its right to include Faulkner in its general remedial plans. We therefore provide special, conditional relief for Faulkner, requiring that she be admitted to the Corps of Cadets unless, before the beginning of Faulkner's junior year, the state provides a parallel program that meets the criteria of VMI II and is approved by the court, or unless the state selects some other acceptable option, as discussed in VMI I, 976 F.2d at 900. This conditional, special relief follows from Faulkner's circumstances and the defendants' response to them, and it does not alter our determination that South Carolina may still elect to offer single-gender education to men and women, as discussed above. Thus, we adopt a bifurcated remedy which (1) affords the state an opportunity to select its course for providing higher education to its citizens in general, but (2) requires The Citadel to admit Faulkner to its Corps of Cadets if the state is unable to accomplish an acceptable alternative plan by August 1995.
 
 V
 
 49
 In sum, for the reasons given, we affirm the district court's conclusion that South Carolina and The Citadel are in violation of the Equal Protection Clause in offering, without sufficient justification, single-gender education only to males. We also affirm the substance of the district court's remedial order, but with the modification that it establish a timely but practicable schedule for South Carolina to formulate, adopt, and implement a plan that conforms with the Equal Protection Clause, and if the plan is not court approved and implemented by the date in August 1995 when the Cadets are required to report, The Citadel must admit Shannon Faulkner to the Corps of Cadets as ordered by the district court.
 
 
 50
 AFFIRMED AS MODIFIED AND REMANDED.
 
 K.K. HALL, Circuit Judge, concurring:
 
 51
 This court's VMI precedents* bear heavily upon both the result and the remedy in this case. Judge Niemeyer quite correctly concludes, ante at 448, that South Carolina's proffered justification for denying its daughters an educational opportunity that it provides for its sons is of no more substance than Virginia's policy of exclusion under the perverse guise of "diversity." VMI I at 898-99.
 
 
 52
 Although South Carolina has put off for almost three years squarely addressing the constitutional deficiency that has been obvious to all who would see, ante at 449, allowing the state a reasonable time to correct the deficiency is consistent with our approach in VMI I. However, as Judge Niemeyer recognizes, time is Shannon Faulkner's most precious possession, and it is running out. Because Judge Niemeyer's disposition of this case provides--in the absence of South Carolina's timely implementation of a remedy that comports with VMI II--for the soonest practicable admission of Ms. Faulkner into The Citadel's Corps of Cadets, and because I am bound to respect the precedents of this circuit, I join fully in his opinion.
 
 
 53
 I choose to write separately because I am convinced that we have embarked on a path that will inevitably fall short of providing women their deserved equal access to important avenues of power and responsibility. We began this unfortunate journey in VMI I, when we promoted a means to an end--single gender education--to the status of an end in itself and avoided ascertaining, let alone analyzing, the true purpose behind the state's decision to keep women out of VMI. Though we correctly concluded that maintaining the status quo offended the Constitution, we failed to mandate VMI's integration--and thus we failed.
 
 
 54
 Our failure became apparent in VMI II, long after the time had passed to ask the only question that matters: "Why has the state decided to create or maintain this institution for the benefit of only one gender?" Instead, we were constrained to ask a wholly irrelevant one: "Does the state offer a 'substantively comparable' educational option to the other gender?" As Chief Justice Warren once observed, separate educational facilities are inherently incomparable, substantively or otherwise. "[T]he opportunity of an education[,] ... where the state has undertaken to provide it, is a right which must be made available to all on equal terms.... Separate educational facilities are inherently unequal." Brown v. Board of Education of Topeka, 347 U.S. 483, 493-95, 74 S.Ct. 686, 691-92, 98 L.Ed. 873 (1954) (Brown I).
 
 
 55
 In fact, though VMI, The Citadel, and their advocates have ceaselessly insisted that education is at the heart of this debate, I suspect that these cases have very little to do with education. They instead have very much to do with wealth, power, and the ability of those who have it now to determine who will have it later. The daughters of Virginia and South Carolina have every right to insist that their tax dollars no longer be spent to support what amount to fraternal organizations whose initiates emerge as full-fledged members of an all-male aristocracy. Though our nation has, throughout its history, discounted the contributions and wasted the abilities of the female half of its population, it cannot continue to do so. As we prepare, together, to face the twenty-first century, we simply cannot afford to preserve a relic of the nineteenth.
 
 HAMILTON, Circuit Judge, dissenting:
 
 56
 The majority annunciates the district court's disregard of Equal Protection analysis, comity, and federalism. In disregarding the Tenth Amendment, the majority permits a single district judge to dictate the higher educational policies and related financial considerations of the State of South Carolina based on a flawed legal premise. I believe that the State of South Carolina, not the federal judiciary, is the proper authority to determine its own educational policies and to execute these policies based on its limited financial resources. Given that there is no demand for a Citadel for women in South Carolina seeking an educational experience comparable to that of The Citadel--thereby demonstrating a substantial justification--I conclude there is no equal protection violation. Because the majority eviscerates the sovereign power of the State of South Carolina, as well as ignores well-settled principles concerning the Equal Protection Clause, I dissent.
 
 I.
 A.
 
 57
 In May 1993, the General Assembly of South Carolina adopted a concurrent resolution to declare the public policy objectives of South Carolina's interest in establishing single-gender institutions of higher learning. This resolution stated that South Carolina had long supported single-gender education based on legitimate state interests if sufficient demand existed for single-gender programs justifying the expenditure of public funds to support such programs. Subsequently, the General Assembly of South Carolina created a Legislative Study Committee (Committee) "to assist the State of South Carolina in carrying out its responsibilities of providing single-gender educational opportunities for women...." (J.A. 1074). On January 11, 1994, the Committee reported its findings to the General Assembly. The Committee concluded that South Carolina had a long history of supporting single-gender education for both men and women when justified by demand and if consistent with the educational goal of the institution. The Committee specifically examined female interest in a single-gender military institution and ultimately found that there was no interest in, and no demand for, a single-gender military college in South Carolina for women. The Committee also reported that it was prepared to assist the General Assembly in examining further possibilities for single-gender educational opportunities for women in South Carolina. On January 14, 1994, the Committee's findings were approved and accepted by the General Assembly.
 
 B.
 
 58
 After this court issued United States v. Virginia, 976 F.2d 890 (4th Cir.1992) (VMI I), cert. denied, --- U.S. ----, 113 S.Ct. 2431, 124 L.Ed.2d 651 (1993), Faulkner sought admission into the Corps of Cadets, contending that even if single-gender education was pedagogically justified and essential to The Citadel's methodology, South Carolina could not justify offering the benefits of the Corps of Cadets to men only. Accordingly, Faulkner demanded immediate admission into the Corps of Cadets. The district court granted a preliminary injunction ordering that Faulkner be permitted to attend day classes at The Citadel. On appeal, this court sustained the preliminary injunction, but eschewed the contention that gender classification can never be justified or that facilities for the sexes must be identical. See Faulkner v. Jones, 10 F.3d 226, 232 (4th Cir.1993) (majority opinion) (Faulkner I). Rather, the majority opinion explained that facilities used to accommodate the sexes may differ, and that in analyzing the separate facilities, a court "must take into account the nature of the difference on which the separation is based, the relevant benefits to and the needs of each gender, the demand (both in terms of quality and quantity ), and any other relevant factor." Id. (emphasis added).
 
 
 59
 Subsequently, on February 17, 1994, Faulkner moved for summary judgment, seeking immediate admission into the Corps of Cadets. With respect to liability, Faulkner argued that VMI I mandated liability. With respect to remedy, she asserted that coeducation of The Citadel was the only remedy; furthermore, she contested the value of single-gender education at The Citadel. The Citadel opposed Faulkner's motion for summary judgment and moved unsuccessfully to bifurcate the trial with respect to liability and remedy.
 
 
 60
 On March 1, 1994, the district court ordered a trial on the issues of liability and remedy to commence concurrently on May 16, 1994. With respect to liability, the district court ordered that the liability portion of the trial be limited to those issues that The Citadel contended differentiated this suit from VMI I and precluded summary judgment in favor of Faulkner. With respect to remedy, the district court ordered that The Citadel file a remedial plan by April 1, 1994. The district court ordered the remedial plan by this date and tried the issue of remedy concurrently with liability because it concluded that since the General Assembly had enacted the concurrent resolution in May 1993 and adopted the Committee's findings in January 1994, The Citadel was on notice and should have been preparing a remedy. The district court issued this order despite the fact that liability had not even been determined. Complying with the district court's order, The Citadel filed a proposed remedial plan on April 1, 1994. In keeping with state policy, the plan did not propose coeducation of The Citadel as a remedy. Because there was no ruling on liability, the remedial plan provided both single-gender and coeducational remedial options and requested sixty days from any determination of liability to designate a specific remedy for further development and implementation. The result of the district court's order was that The Citadel had to propose a remedy even though no trial had commenced and its single-gender educational program had not been found constitutionally impermissible. The Citadel, therefore, had to devise a remedy, without parameters, for an unknown, alleged wrong.
 
 
 61
 During pretrial proceedings, the district court stated that it was bound by VMI I, but it refused to rule on The Citadel's motion in limine and its motion during trial for a declaration of issues as to the binding nature of VMI I. The Citadel sought a declaration with respect to these issues because Faulkner continued to repudiate VMI I. In this confused and confusing state of affairs, the case proceeded to trial. For purposes of liability, the district court reluctantly adopted the finding in VMI I with respect to the value of single-gender education and the inevitable fundamental changes coeducation would have on the adversative nature of The Citadel's single-gender program. From this premise, the district court stated that The Citadel had to distinguish its case from VMI I by "justifying" the males-only policy at The Citadel. Recognizing that VMI I did not hold that single-gender education amounted to a per se constitutional violation, The Citadel essentially offered three reasons for maintaining the males-only policy. First, The Citadel put on unrebutted evidence that the reason that there was no female Citadel in South Carolina, or elsewhere, was because there was no demand for such an institution, not because South Carolina discriminated against women based on gender. Second, South Carolina had a policy of aiding the education of women by providing tuition grants and loans so that women could attend the state's two private women's colleges. Third, South Carolina demonstrated that it has finite resources with respect to providing funds for college programs. In a nutshell, South Carolina showed that it supported single-gender education, that it provided aid to women at institutions of higher learning, but that it could accomplish these objectives only if based on demand and consistent with the educational mission of the institution.
 
 
 62
 The district court issued a memorandum opinion reciting findings of fact and conclusions of law. With respect to liability, the district court found that South Carolina had a policy of providing a variety of educational programs in response to demand and available resources and that there was no interest in South Carolina for a Citadel-type educational experience for women. As the district court found, "[t]here does not appear to be any substantial interest in South Carolina for the establishment of an all-female military institution like The Citadel." Faulkner v. Jones, 858 F.Supp. 552, 560 (D.S.C.1994). Additionally, the district court recognized that there was no demand for a female-Citadel and that the policy of the State of South Carolina is "to provide educational opportunities based on reasonable demand...." Id. at 564. Despite these findings, the district court held that lack of demand and the expenditure of limited state resources could not justify The Citadel's male-only program. Accordingly, the district court found that The Citadel's male-only policy did not survive constitutional challenge. With respect to remedy, the district court ordered that Faulkner immediately be admitted into the Corps of Cadets. The district court further ordered The Citadel to devise a plan for coeducation of the Corps of Cadets, or it would order coeducation.
 
 II.
 
 63
 The district court concluded that it was bound by VMI I, and thus it realized that single-gender education is valuable and eminently justified. Furthermore, the district court found that there was no demand for a "female Citadel" in South Carolina. See id. at 560, 564. Despite recognizing justification for single-gender educational programs and an absence of demand for a Citadel-type institution for women, the district court concluded that South Carolina's educational policies were constitutionally irrelevant, a conclusion with which I cannot agree. A review of our precedents is necessary to reveal the flaws in the district court's reasoning. Because South Carolina articulated a substantial justification for not providing a Citadel-type institution for women, Faulkner's Equal Protection challenge fails.
 
 A.
 
 64
 VMI I recognizes that, absent a substantial justification, a state violates the Equal Protection Clause if it provides a benefit to one gender but not the other. In VMI I, after explaining that the Equal Protection Clause does not erect a per se bar to a state's power to create classifications and treat various classes differently, we concluded that single-gender education not only provided academic and practical salutary consequences, VMI I, 976 F.2d at 897, but also that single-gender education was pedagogically justifiable, id. at 898.[1] Moreover, recognizing the unique, rich, and venerable history and educational philosophy propounded by the Virginia Military Institute (VMI), we concluded further that the "holistic formula of training" at VMI was particularly justified. Id. Balanced against the pedagogical benefits and justification provided by a single-gender institution exclusively for men, however, was the fact that the Commonwealth of Virginia could not deny these benefits to women absent a substantial justification, and the proffered reason of providing diversity in education failed to satisfy that burden. Id. at 900. Central to our analysis was the fact that there was no justification for the male-only policy at VMI; the issue of demand was neither raised nor addressed. Indeed, Virginia proffered no evidence of a lack of demand for a VMI-type program for women. Virginia, therefore, had defaulted on this issue. Because Virginia failed to provide an educational experience like that of VMI for women, we remanded the case to the district court to give Virginia the opportunity to remedy any constitutional violation. Id. In reaching our holding in VMI I, we acknowledged--most sagaciously--that the state, not the federal judiciary, must, in the first instance, be granted the opportunity to devise a plan that passes constitutional muster. Id. Satisfaction of constitutional concerns, we explained, did not mandate automatically the admission of women to VMI. The principle to be garnered from VMI I, therefore, is that while state-supported, single-gender educational institutions serve valuable purposes and provide unique educational benefits, a state cannot provide such a benefit to one sex and not the other, absent substantial justification, without violating the Equal Protection Clause, and upon the determination of such a violation, the state is afforded the first opportunity to remedy any constitutional infirmity. Conspicuously in VMI I, there was no substantial justification for Virginia's not providing a VMI-type education for women. Thus, demand for such an institution or program was not an issue and was never before the court in VMI I.
 
 B.
 
 65
 On remand in VMI I, Virginia remedied the constitutional deficiency by creating a parallel educational program substantially analogous to that of VMI at Mary Baldwin College. Thus was born the Virginia Women's Institute for Leadership (VWIL). See United States v. Commonwealth of Virginia, 852 F.Supp. 471, 476 (W.D.Va.1994). Appreciating the pedagogical values of single-gender education, id. at 475-76, the duty of Virginia to provide a VMI-style education for women, id. at 474, the substance and merit of the VWIL program, even though its methodology differed from VMI, id. at 476-81, as well as Virginia's commitment to ensure the success of VWIL, id. at 483-84, the district court concluded that the VWIL program did not offend the Equal Protection Clause, id. at 484.
 
 
 66
 We affirmed the district court's approval of VWIL and remanded the case to the district court so that it could oversee implementation of the remedy. See United States v. Virginia (VMI II), 44 F.3d 1229 (4th Cir.1995). In VMI II, our task was to determine generally whether the parallel program was constitutionally sound and to determine specifically whether the VWIL program was substantively comparable to VMI. Applying the intermediate level of scrutiny announced in Mississippi University for Women v. Hogan, 458 U.S. 718, 102 S.Ct. 3331, 73 L.Ed.2d 1090 (1982), we concluded that VWIL satisfied the Equal Protection Clause. First, we explained that single-gender education is beneficial, justifiable, and thus fulfills a legitimate and important state objective. VMI II, 44 F.3d at 1237-39. Second, we concluded that the requisite substantial relationship between the objective and the means was present because Virginia instituted a comparable program for women at Mary Baldwin College, thereby satisfying the state's obligation of providing equal protection through the implementation of equal programs at different schools. Id. at 1239-41.
 
 
 67
 In concluding that the VWIL program was substantively comparable, we stated that the Equal Protection Clause did not demand identical programs, nor identical execution of programs for educating men and women; methodologies may differ. Id. at 1240-41. The task force charged with maintaining VWIL concluded that had the VWIL been identical to VMI, there would have been no "significant" interest in such a program and "doubt[ed] that enough women would be interested in a women's VMI to make it work." Id. at 1235. Because both VWIL and VMI focused not only on traditional academics, but also on discipline and leadership, we concluded that the Equal Protection Clause was not offended by VWIL, although it differed from VMI, because, while "[t]he mechanism for achieving these goals differ[ed], ... the difference [was] attributable to a professional judgment of how best to provide the same opportunity." Id. at 1240-41. Although the focus of VMI II was one of remedy, implicit in VMI II is the fact that there must be demand for a particular educational program, and making this determination necessarily involves questions of expenditure of state resources.
 
 III.
 A.
 
 68
 Applying our precedents, The Citadel's male-only policy does not fail to pass constitutional muster. The Citadel has maintained steadfastly, consistently, and correctly so, that there is no demand for a Citadel-type educational program for women. See Faulkner, 858 F.Supp. at 560, 564. The record more than adequately supports this position; indeed, Faulkner conceded this point, and the district court found it as a fact. There is simply and indisputably no demand in South Carolina for a Citadel-type educational program for women. For instance, Robert Gallagher, Chairman of the State Commission for Higher Education, testified that no institution or individual has come to the Commission seeking to establish either a single-gender program or institution for women similar to that of The Citadel. Buttressing this testimony, former Governor Edwards of South Carolina not only testified that there was no demand for a Citadel-type institution or program for women, but that South Carolina maintains a policy of aiding women with higher education by providing grants and tuition stipends. Thus, there is substantial justification for South Carolina's excluding Faulkner from entering the Corps of Cadets. While the law does not require a futile act, see L.K. Comstock & Co. v. United Eng'rs & Constr., 880 F.2d 219, 232 (9th Cir.1989), that is precisely what the majority is compelling South Carolina to perform. The absence of demand is a sufficient justification for not providing women a Citadel-type institution. In VMI I, we anticipated the vitality of such a justification, expressly observing that a state can have a substantial justification for its classification; and in VMI II, we observed that the Equal Protection Clause was not violated if there was "significant" interest in VWIL and there was no interest in a women's program identical to VMI. Unlike the Commonwealth of Virginia in VMI I, the State of South Carolina demonstrated a substantial justification for the male-only policy at The Citadel--lack of demand for a Citadel-type institution for women. To compel a state, laboring under limited financial resources, to institute such a program is not only economically repugnant, but also turns the federal judiciary into a super-commission on higher education, apparently charged with superior knowledge and powers of deciding public educational policies, as well as state fiscal policies. Apart from being an unwarranted, improper intrusion into state affairs, see Stroman v. Colleton County Sch. Dist., 981 F.2d 152, 158 (4th Cir.1992), this resurrects the infamous ghoul of Lochner v. New York, 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (1905) (holding unconstitutional a New York statute providing that no employee will work in a bakery more than sixty hours in any week or more than ten hours in any day), which, although in the context of substantive due process analysis, has been discredited as an example of the Court's usurpation of power of the local legislature, see, e.g., Olsen v. Nebraska, 313 U.S. 236, 61 S.Ct. 862, 85 L.Ed. 1305 (1941) (repudiating Lochner analysis). As the Court subsequently explained, "if our recent cases mean anything, they leave debatable issues as respect business, economic, and social affairs to legislative decisions. We could strike down this law only if we returned to the philosophy of the Lochner, Coppage [v. Kansas, 236 U.S. 1, 35 S.Ct. 240, 59 L.Ed. 441 (1915)] and Adkins [v. Children's Hospital, 261 U.S. 525, 43 S.Ct. 394, 67 L.Ed. 785 (1923)] cases." Day-Brite Lighting, Inc. v. Missouri, 342 U.S. 421, 425, 72 S.Ct. 405, 408, 96 L.Ed. 469 (1952). Although purporting to eschew the contention, VMI II, 44 F.3d at 1236, the majority is engaging in substantive equal protection analysis, and reading substance into the Fourteenth Amendment has been consistently repudiated, see, e.g., Bowers v. Hardwick, 478 U.S. 186, 194-95, 106 S.Ct. 2841, 2846, 92 L.Ed.2d 140 (1986).
 
 
 69
 Faulkner's assertion that The Citadel did not attempt to determine the demand for a parallel program is without merit and belied by the record. The uncontradicted testimony established that South Carolina requires a demonstrated demand as a condition for funding existing and proposed institutions of higher learning, a valid and compelling state interest. Gallagher testified that no institution or individual has sought to establish a Citadel-type institution or program for women. Furthermore, former Governor Edwards testified that there was no demand for a Citadel-type institution or program for women. Faulkner cannot escape the conclusion that lack of demand is a gender-neutral, noninvidious, substantial justification for The Citadel, in order to preserve its unique educational experience, to remain all-male. In my opinion, South Carolina must maintain the autonomy in deciding how to allocate its finite resources, and this principle is particularly salient here because, as all parties and the district court agree, there is absolutely no demand for a "female Citadel," see Faulkner, 858 F.Supp. at 560, 564, but, under the majority's decision, South Carolina will be compelled to create one, a remedy that is doubly futile because Faulkner has repudiated both remedies, i.e., a parallel program similar to VWIL and a "female Citadel." Because South Carolina has not defaulted on its burden of demonstrating a substantial justification for not providing a Citadel-type institution for women, the Equal Protection Clause is not offended.
 
 B.
 
 70
 Throughout this litigation, Faulkner has represented vehemently that she does not want a Citadel for women or a parallel program such as VWIL. Rather, her sole purpose is to gatecrash her way into the Corps of Cadets, contending that any single-gender program is per se unconstitutional. In addition to being contrary to established law, see, e.g., VMI II, 44 F.3d at 1236-38; Faulkner I, 10 F.3d at 230-32; VMI I, 976 F.2d at 895-97, this assertion fails to perceive the substantive-comparability component of VMI II in which we recognized that different methods can be used to achieve similar goals. Here, Faulkner does not want a "female Citadel," contending that the nature of The Citadel experience cannot be replicated. She wants to join the Corps of Cadets because it can provide her with a unique educational experience, but, as all parties agree, the unique experience provided by The Citadel is grounded in its single-gender status. By joining the Corps of Cadets, Faulkner, again as all agree, would be destroying the very uniqueness that makes the Corps of Cadets the heart of The Citadel. By getting her wish, Faulkner destroys that which she seeks to attain.
 
 
 71
 The history of this litigation raises serious questions as to whether Faulkner is content with destroying the unique nature of The Citadel. It could be suggested Faulkner is far more interested in the publicity, notoriety, and purchasable opportunities of being the first female admitted to the Corps of Cadets, as opposed to a sincere desire to seek and obtain the type of discipline and leadership training afforded by The Citadel. For instance, Faulkner spearheaded a fundraiser in which she sold photographs of herself purportedly to defray her legal expenses. See Senator to Join Rally for Faulkner, The State, Mar. 17, 1995. Additionally, Faulkner--improperly--donned the jacket of a cadet while making a speech to raise money for her cause. See Leah Garchik, Dressing Well?, S.F. Chron., Nov. 21, 1991, at D16. Publicity, not equal protection of the law, seems to be the hallmark of Faulkner's creed.
 
 IV.
 
 72
 I cannot accept the majority's invitation to be a party to the destruction of a venerable institution that, as the majority recognizes, provides a pedagogically justifiable, unique educational experience which is attributed to its single-gender status. The majority finds a violation of the Equal Protection Clause without addressing South Carolina's substantial justification for not providing a Citadel-type institution or program for women. Disappointingly, the majority reaches this conclusion in the wake of an absolute absence of demand for such a program. I would reverse the district court's holding that The Citadel's male-only status violated the Equal Protection Clause and consequently its specific remedy of ordering Faulkner admitted to the Corps of Cadets and its general remedy of coeducation at The Citadel.
 
 
 
 [1]
 In particular, the district court denied Faulkner's request (1) to have a special sexual harassment committee appointed, (2) to be provided a special escort on campus at night, and (3) to prohibit The Citadel from giving her the same type of haircut that it gives male Fourth Class members of the Corps of Cadets. The court also directed that Faulkner be provided living quarters with "at least the same level of security" at night as male cadets have in their barracks. The parties did not appeal the conditions imposed by the August 5 order
 
 
 [2]
 The court observed that "no survey has been conducted to determine ... how many women would be interested in pursuing a public single-sex education" and that "[t]he interest of South Carolina women in attending a Mary Baldwin-type program [see VMI II ] is unknown." 858 F.Supp. at 560. The court also found with respect to demand among women for coeducation at The Citadel:
 The Citadel does not recruit women for the Corps of Cadets and has not through the years kept records for how many women have expressed an interest in attending the institution. In addition, no survey has been conducted to determine how many women are interested in joining the Corps of Cadets.... In the past year, however, forty-three women have inquired about The Citadel's Corps of Cadets, but the seriousness of their interest has not been determined.
 Id. The court concluded, based on the experience at the U.S. military academies, that if The Citadel were to become coeducational, between 20 and 50 women would be attracted to the school annually. Id.
 
 
 [3]
 VMI I was commenced in March 1990, see 976 F.2d at 894, and the district court rendered its initial opinion in June 1991, see United States v. Commonwealth of Virginia, 766 F.Supp. 1407 (W.D.Va.1991)
 
 
 *
 United States v. Commonwealth of Virginia, 976 F.2d 890 (4th Cir.1992), cert. denied, --- U.S. ----, 113 S.Ct. 2431, 124 L.Ed.2d 651 (1993) (VMI I ); United States v. Commonwealth of Virginia, 44 F.3d 1229 (4th Cir.1995) (VMI II)
 
 
 [1]
 This conclusion comports with current thought among many educated women. For instance, at Columbia College, a women's school in Columbia, South Carolina, students state that a single-gender education provides an invaluable educational experience that could not be reproduced with the presence of men. After observing an increasing trend and desire for single-gender educational institutions, the article reports that graduates of single-gender educational institutions typically excel in a variety of careers. Lori Roberts, Single-gender Schools Gain Students, Popularity, The State, Feb. 12, 1995. Likewise, women at Texas Woman's University have vehemently attempted to prevent the coeducation of their college. Carrying placards that read "Better Dead Than Coed," students explained the unique benefits of their single-gender education:
 Female TWU students say the school provides a nurturing environment for women. Students at protests have said that not having to ... be distracted by men improves their chances of a good education.
 Women Battle to Keep Men out of Their School, N.Y. Times, Apr. 5, 1991.